UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Rixene Hicks

      Plaintiff,

                                  Re:  Civil Action No. 07 –1959(HHK)

   Vs

Lori Bledsoe,

      Defendant

## MOTION TO AMEND RESTRAINING ORDER

I, Rixene Hicks, and plaintiff in this action seek to amend the original filing for a restraining order, sent to this US District Court on October 31, 2007, from DC Superior court, to include damages and other costs incurred as a result of the potentially dangerous and malicious attack on me at my place of work on June 6, 2007.  I seek the maximum damages allowed by law, for the injuries I sustained through unlawful willful acts of Ms. Bledsoe, and through acts of negligence on her part and negligence on the part of others in the government who have failed to properly investigate Ms. Bledsoe's conduct of June 6, 2007, who have resisted my efforts to correct the wrong done to me, and who have openly blocked and denied me my rights involving prohibited personnel practices, including refusing to assist me in filing for worker's compensation benefits…. even willing to break the law in respect to the timely filing  for these benefits.  These unlawful acts initiated in part and carried out by Ms. Bledsoe and others, continue until this day and are causing me undue emotional duress, as well as physical and financial hardship.  I have also been humiliated and embarrassed in many respects over these matters.  Further, there appears to be an effort by agency officials, to cover up or deny that the attack took place. The basis for my motion to amend for damages and other costs, is as follows:

My initial filing sought protection from Lori Bledsoe upon receiving a letter, which essentially exonerated Lori Bledsoe of my allegations, written by Ms. Etheridge, a new member in Human Resources Division of Pension Benefit Guaranty Corporation, but the signature was signed by someone unknown to me.  Prior to this letter, I had been told that Ms. Bledsoe would not come in contact with me as she would be working from home.

Lori Bledsoe, my EEO supervisor and a former employee of the Justice Department, had acted in an unprovoked violent manner towards me on June 6, 2006, when she grabbed my hand while on the door knob as I tried to leave her office, blocked my exit, slammed the door shut and held me hostage for approximately 10 minutes. This was done at the close of business when most employees had likely vacated the building and it was beyond my normal tour of duty.



RECEIVED

MAR 2 8 2008

NANCY MAYER WHITTINGTON. CLERK
U.S. DISTRICT COURT

On that day, June 6th, Ms. Bledsoe had summoned me to her office for one purpose, but when I arrived, less than one minute later, she introduced a totally different reason for my presence and placed in front of me a document, which she assembled in my presence and demanded my signature in the document without me reading it. When I refused and said that I was going to find a witness to what she had planned, she hurled threats at me and she got up from behind her desk and blocked my departure by the above described means.

Lori Bledsoe was apparently motivated to get my signature in this document in an effort to shift blame to me for her and the EEO Director's budget management failures that I had exposed to others, which allowed debts to accrue against the government for obligations in excess of $86K. Lori Bledsoe and Stephanie Holder, the EEO Director were upset over the two issues that I had exposed, their handling of a part time student's leave and pay and over the unpaid invoices they caused. Her actions in this were purely retaliatory and I can prove it. *See Exhibit   May 26th Memorandum mentioning the invoices*

I reported the incident the next morning, June 7, 2007 to Ruben Moreno, Employee Relations Manager and Ricardo Silva, an Employee Relations Specialist in the Human Resource Division, by written memorandum and verbal discussion. Mr. Moreno asserted that they would "take care of it", intimating that, it was not necessary for me to call the police as I had questioned. *See Exhibit 1, June 6 memorandum.*

I was understandably distraught and suffered anxiety over Lori Bledsoe's unexpected actions and was physically injured when Ms.. Bledsoe slammed the door shut. A recent second opinion by another orthopedic doctor, confirmed that my continuous and progressive pain in the shoulder stems. from a torn rotary cuff; both doctors have advised it will require surgery to correct. I am scheduled for this surgery in May 08.

I learned in late October 07 that the Office of Inspector General, who I believe is the proper investigative authority in my agency, had not conducted the investigation into the incident; that in fact, they had not been made aware of the incident, that the investigation had been handled by personnel from Human Resources and the Office of General Counsel and they were not operating not under any supervision from, or knowledge by, the Office of Inspector General. I believe that this process allowed for important and relevant facts into the incident to be omitted, covered up, mischaracterized and/or overlooked. These negligent acts have contributed to delays and other failures in my efforts to pursue my rights. Other governmental agencies and their agents, may have been more responsive to issues I have raised, had I been able to provide an official and fact-based report produced by the Office of the Inspector General.

I reported the incident to the Federal Protective Services and have met with Homeland Security Department investigators. I am presently waiting for a report from the investigators as to whether there was criminal behavior involved in the June 6th incident, which, Pension Benefit Guaranty Corporation failed to investigate. And they failed to report the incident to authorities…. mishandling intentionally, or otherwise, the investigation.

I have been forced into a leave without pay status while undergoing anxiety related and other medical treatment for the injury sustained because government agents have delayed and outright

refused to timely submit my worker's compensation claim, while others who committed these unlawful and possibly criminal acts, are being provided protection by the government at my expense and they are still gainfully employed.

I have had to borrow funds to cover routine bills and out of pocket expenses for legal representation, just to get my claim submitted to the Department of Labor after exhaustive failed efforts with officials within my agency. To date, the costs for leave, legal fees and other out of pocket medical and insurance medical claims. associated with this injury are approximately $50K- $60K and expected to climb even higher.

I have been humiliated and also harmed for future potential employment opportunities as a result of this injury and the injustice done to me by agency officials at PBGC for blowing the whistle on improper practices within the agency, (gross mismanagement of funds, abuse of power regarding leave and the vicious attack on me) and for exercising my rights under the law to file complaints about it.

My agency's negligible actions have caused immeasurable harm to my career and have made it impossible to date for me to finance and obtain legal counsel for this court appearance. Thus I pray to this Honorable Court for mercy and respectfully request justice be done within the full scope and discretion of the Courts' authority and grant my request to amend the TRO to include damages and other related costs.

Respectfully submitted,

Rixene Hicks *Rixene Hicks*

*March 28, 2008*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day, March 28, 2008, I sent by first class US mail, MOTION TO AMEND RESTRAINING ORDER, to:

Heather D. Graham-Oliver
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.Civil Division
Washington, DC 20530

Rixene W.Hicks

Rixene W. Hicks

<u>MEMORANDUM</u>

To:     Lori J. Bledsoe, Manager
        Equal Employment Opportunity Department

From:   Rixene Hicks, Administrative Specialist *Rixene Hicks*
        Equal Employment Opportunity Department

Date:   May 26, 2007

Re:     Surprise Discussion of May 25, 2007

This is to confirm in writing certain actions and comments you made when you stopped
by my office on Friday, May 25, 2007 at approximately 5:30 p.m. As you were about to
depart, after our brief discussion on a budget matter, you paused then turned back toward
me and closed the door to my office. You had not scheduled any meeting so, I was
naturally surprised by this, as it was not your practice. I also assumed that this was not an
official visit since I had no advance knowledge of it and was not prepared for a formal
discussion. I am concerned by this visit as its purpose was unclear and your behavior
was highly unusual. As such, I find it necessary to commit to writing what transpired,
stated in similar words or expressions below:

1) You began rather hesitantly by stating that Human Relations had advised you of
   my request to see my personnel folder. You were concerned by this and asked
   why I had found it necessary to review my folder.

2) I responded to you that I had reviewed my personnel folder; checking on the due
   date for my upcoming promotion and asked why you felt that this was a problem.

3) You then asked why did I think I would be getting a promotion? I replied
   rhetorically, if there was any reason why I would not? You then mentioned in
   rather vague and nebulous terms that you had given me " a discussion of sorts" on
   May 10, 2007, the day you gave me my job elements and my evaluation
   standards, along with a few negative half-hearted verbal comments. You
   intimated yesterday, Friday, May 25th, that you considered the act of giving me
   those job elements and standards two weeks before my promotion was due, as
   some sort of evaluation of my performance, although you never said so at the time
   and did not state it to be the case during the instant conversation either.

4) I was taken aback by such comments on Friday, May 25, 2007, and your overall
   general behavior on this unscheduled visit and responded to you by asking, even
   if it was your intent to have evaluated me two weeks ago just before my
   promotion was due, whether you thought such an act would have been fair and
   consistent with proper procedures as set out by the agency under the CFR? You
   failed to respond.

5) You also said that I should have come to you rather than looking in my personnel folder if I wanted to know anything about my promotion, suggesting that I had no right to review my folder on my own and without your knowledge and consent.

6) You proceeded to say that you had given me job standards on October 19, 2006. We both know that this is not true. You asked me to draft elements and standards in October 2006. When I gave you my proposal for standards you simply commented that they were good and some of them should be for your job and, that you would get back with me later...you never did...not until May 10, 2007, when you gave them back to me unchanged; they were the same as the draft I had given to you in October 2006. We never discussed nor acted on any final standards. When I submitted the proposed elements and standards in October 2006, you requested that I date the cover of the transmittal to you, for October 19, 2006. I did as you asked because I assumed that the different date from the <u>actual date</u> was for some harmless reason unbeknownst to me...now, after your visit on Friday, I am not so sure.

As you know, we had what I considered a very good working relationship at one time but unfortunately, the current hostile environment in the EEO Office has apparently changed that relationship over the last several months. It is my view that this environment has compromised the official goals of this office and ultimately the goals of the agency. You also know that the budget problems the office has had, were problems and issues that were in existence, long before my employment in the EEO office. Given all of the above, and there is even more that I could say, I have no idea why you are "hinting" at this late hour, that my performance, and consequentially my promotion, could be in question. If the federal agency procedures are properly followed, I fully expect to be promoted on schedule and without incident.

In an effort to protect my interest and my rights, I have put this in writing for the record. When we meet on Tuesday to continue the conversation, I will need to know if you plan to or if you have signed the personnel form SF52 in order for me to be promoted. My effective date is May 27, 2007.

This memorandum is true and correct to the best of my knowledge and belief.

## Hicks Rixene

| | |
|---|---|
| **From:** | McKinnon Wayne |
| **Sent:** | Wednesday, July 26, 2006 6:14 PM |
| **To:** | Hicks Rixene |
| **Subject:** | FW: Invoices |
| **Attachments:** | Outstanding Invoices 1.xls |

FYI

-----Original Message-----
**From:** McKinnon Wayne
**Sent:** Wednesday, July 26, 2006 6:12 PM
**To:** Bledsoe Lori
**Cc:** Winter Theodore; Solomon Tasha; Obermiller Laureen
**Subject:** FW: Invoices

Lori,

The unpaid invoices (attached) for Laureen's interpreter service continues to be an issue. I must inform you of just how embarrassing this is to Laureen when she contacts the agency for assistance and is referred to accounting regarding the unpaid invoices that are the responsibility of your office. We have exchanged a copious number of e-mails regarding the payment of these invoices. Earlier this year, we met with you and PD to set up a procedure to pay the invoices on the credit card, so I am not sure why this is not happening. Laureen is a supervisor in accounting and is heavily involved in the implementation of the new CFS accounting system. She absolutely has a need for interpreters on a daily basis. Please don't make the mistake of letting this vital service be discontinued. Your attention to this matter is appreciated.

-----Original Message-----
**From:** Obermiller Laureen
**Sent:** Wednesday, July 26, 2006 7:00 AM
**To:** McKinnon Wayne
**Cc:** Solomon Tasha
**Subject:** FW: Invoices

Here is the spreadsheet showing our outstanding invoices.

**From:** Scott Tatem [mailto:Billing@vli-dc.com]
**Sent:** Tuesday, July 11, 2006 9:49 AM
**To:** Obermiller Laureen
**Subject:** RE: Invoices

Laureen,

Attached, you will find an excel spreadsheet of those invoices since October 24, 2005. The last payment was done by a credit card – two transactions in the amount of $3,284.50 for invoice B5576 on May 5, 2005.

Scott

3:53 PM
07/10/06
Accrual Basis

## Visual Language Interpreting
# Find Report
### All Transactions

| Date | Num | Name | Memo | Amount |
|------|-----|------|------|--------|
| 07/10/2006 | B5816 | Pension Benefit Guaranty Corp. | 7/10: SENT | 2,757.00 |
| 07/10/2006 | B5817 | Pension Benefit Guaranty Corp. | 7/10: SENT | 1,702.00 |
| 06/23/2006 | B5792 | Pension Benefit Guaranty Corp. | 6/23: SENT | 1,472.50 |
| 06/14/2006 | B5779 | Pension Benefit Guaranty Corp. | 6/14: SENT | 2,502.00 |
| 06/01/2006 | B5754 | Pension Benefit Guaranty Corp. | 6/1: SENT | 1,276.50 |
| 05/31/2006 | B5745 | Pension Benefit Guaranty Corp. | 6/1: SENT | 1,276.50 |
| 04/27/2006 | B5652 | Pension Benefit Guaranty Corp. | 4/27: SENT | 1,702.00 |
| 04/26/2006 | B5642 | Pension Benefit Guaranty Corp. | 4/27: SENT | 1,276.50 |
| 04/19/2006 | B5609 | Pension Benefit Guaranty Corp. | 4/26: RE-SENT | 1,600.00 |
| 04/07/2006 | B5576 | Pension Benefit Guaranty Corp. | PAID | 3,284.50 |
| 03/27/2006 | B5550 | Pension Benefit Guaranty Corp. | 3/27: SENT | 3,506.00 |
| 03/22/2006 | B5538 | Pension Benefit Guaranty Corp. | 3/22: SENT | 247.00 |
| 03/17/2006 | B5528 | Pension Benefit Guaranty Corp. | PAID | 2,545.00 |
| 03/16/2006 | B5524 | Pension Benefit Guaranty Corp. | PAID | 272.50 |
| 03/14/2006 | B5502 | Pension Benefit Guaranty Corp. | 3/14: SENT | 1,276.50 |
| 03/14/2006 | B5506 | Pension Benefit Guaranty Corp. | 3/14: SENT | 1,276.50 |
| 03/03/2006 | B5462 | Pension Benefit Guaranty Corp. | 3/3: SENT | 3,404.00 |
| 02/16/2006 | B5454 | Pension Benefit Guaranty Corp. | 3/22: 30 days PD | 851.00 |
| 02/15/2006 | B5450 | Pension Benefit Guaranty Corp. | PAID | 425.50 |
| 02/13/2006 | B5421 | Pension Benefit Guaranty Corp. | PAID | 4,339.50 |
| 02/01/2006 | B5390 | Pension Benefit Guaranty Corp. | 3/6: 30 days PD | 2,825.50 |
| 01/27/2006 | B5373 | Pension Benefit Guaranty Corp. | 3/6: 30 days PD | 4,714.00 |
| 01/16/2006 | B5347 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 1,276.50 |
| 12/16/2005 | B5317 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 851.00 |
| 12/14/2005 | B5307 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 349.00 |
| 12/13/2005 | B5293 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 851.00 |
| 12/13/2005 | B5294 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 247.00 |
| 12/13/2005 | B5304 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 570.50 |
| 12/07/2005 | B5277 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 272.50 |
| 11/30/2005 | B5245 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 1,276.50 |
| 11/14/2005 | B5210 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 2,247.00 |
| 11/07/2005 | B5191 | Pension Benefit Guaranty Corp. | VOID: Duplicate Invoice B5178 | 0.00 |
| 11/04/2005 | B5169 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 851.00 |
| 11/04/2005 | B5178 | Pension Benefit Guaranty Corp. | 4/27: RE-SENT | 1,106.00 |
| 10/24/2005 | B5142 | Pension Benefit Guaranty Corp. | PAID | 851.00 |

**Hicks Rixene**

| | |
|---|---|
| **From:** | Bledsoe Lori |
| **Sent:** | Friday, August 04, 2006 4:50 PM |
| **To:** | Hicks Rixene |
| **Subject:** | FW: SLA Outstanding Invoices being pad by Purchase agreement |

FYI, so you can follow-up on Monday, thanks

-----Original Message-----

| | |
|---|---|
| **From:** | Bledsoe Lori |
| **Sent:** | Friday, August 04, 2006 4:49 PM |
| **To:** | McKinnon Wayne |
| **Cc:** | Hicks Rixene |
| **Subject:** | SLA Outstanding Invoices being pad by Purchase agreement |

Wayne, the same similar problem we had with Laureen's interpreter payments also occurred with Felece Steele's and we converted back from credit card to a BPA to get her firm SLA paid off, as well. The req and invoices have been sent to Jovell by Rixene Hick today. Can you please assist us by asking that these be prioritized for payment.

If you need any additional information, please contact Rixene.

Thanks for your assistance.

*Lori J. Bledsoe*

*EEO Manager*

*Pension Benefit Guaranty Corporation*
*(202) 326-4000 Ext. 3345*
*(202) 326-4276 (Fax)*

*"Every job is a self-portrait of the person who did it. Autograph your work with excellence."*
*Unknown*

**Hicks Rixene**

| | |
|---|---|
| **From:** | McKinnon Wayne |
| **Sent:** | Monday, July 31, 2006 4:30 PM |
| **To:** | Givings Thomas |
| **Cc:** | Hicks Rixene; Williams Larry; Obermiller Laureen; Windsor Audrey; Stewart Marggie; Winter Theodore; Bledsoe Lori; Winter Theodore; Williams Larry; Solomon Tasha; Obermiller Laureen; Windsor Audrey |
| **Subject:** | FW: VLI Invoices |

**Attachments:** VLI Invoicesfor payment 7.31.06.doc

Thomas,

Please prioritize these payments to VLI for Laureen's interpreters.

Thanks Thomas, Lorie and Rixene.

-----Original Message-----

| | |
|---|---|
| **From:** | Hicks Rixene |
| **Sent:** | Monday, July 31, 2006 1:47 PM |
| **To:** | McKinnon Wayne |
| **Subject:** | FW: VLI Invoices |

-----Original Message-----

| | |
|---|---|
| **From:** | Hicks Rixene |
| **Sent:** | Monday, July 31, 2006 1:39 PM |
| **To:** | Bledsoe Lori; 'billing@vli-dc.com' |
| **Cc:** | Obermiller Laureen |
| **Subject:** | VLI Invoices |

The following invoices were submitted to the accounting office for payment.



VLI Invoicesfor
payment 7.31.0...

Good afternoon, the following invoices are in the accounting office for payment:

| Number | Amount |
|--------|--------|
| B5779 | 2,502.00 |
| B5754 | 1,276.50 |
| B5745 | 1,276.50 |
| B5652 | 1,702.00 |
| B5642 | 1,276.50 |
| B5609 | 1,600.00 |
| B5550 | 3,506.00 |
| B5538 | 247.00 |
| B5502 | 1,276.50 |
| B5506 | 1,276.50 |
| B5642 | 3,404.00 |
| B5454 | 851.00 |
| B5390 | 2,825.50 |
| B5373 | 4,714.00 |
| B5347 | 1,276.50 |
| B5317 | 851.00 |
| B5307 | 349.00 |
| B5293 | 851.00 |
| B5294 | 247.00 |
| B5304 | 570.50 |
| B5277 | 272.50 |
| B5245 | 1,276.50 |
| B5210 | 2,247.00 |
| B5169 | 851.00 |
| B5178 | 1,106.00 |
| B5816 | 2,757.00 |
| B5817 | 1,702.00 |
| B5860 | 7,637.50 |

## Hicks Rixene

| | |
|---|---|
| **From:** | Bledsoe Lori |
| **Sent:** | Wednesday, October 25, 2006 10:08 AM |
| **To:** | 'Betty Hudson'; Hicks Rixene |
| **Subject:** | RE: remaining FY06 invoices |

Betty, we will address these asap (beginning with the July /August invoices), determine the status of each and get back to you by next Monday October 30th.

---

**From:** Betty Hudson [mailto:betty@signlanguage.com]
**Sent:** Wednesday, October 25, 2006 9:59 AM
**To:** Hicks Rixene; Bledsoe Lori
**Subject:** remaining FY06 invoices
**Importance:** High

Good morning –

Though some payments for past due invoices have been received, there are still numerous FY06 invoices that remain unpaid. Please review the attached spreadsheet, and let me know when these will be processed and when we can expect payment.

I look forward to your response.

*Betty Hudson*
*Accounting Assistant*
*Sign Language Associates*
*301-962-3044*

*CONFIDENTIALITY NOTICE - This e-mail transmission and any documents, files or previous e-mail messages attached to it are the property of Sign Language Associates, Inc. and may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby instructed that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Alternately, you may contact the Sign Language Associates, Inc. headquarters at 301.946.9710 to inform them of any transmission error before deletion.*

Complaint –Recorded on June 6, 2007

Today June 6, 2007, my supervisor Lori Bledsoe called me by telephone to report to her office for a budget meeting we were to have. As I was about to report to her office, she called to delay the meeting for approximately 40 minutes. She finally met with me at 4:50 PM, only 10 minutes before my tour of duty ends for the day.

She began the meeting criticizing me for some invoices that were delinquent in payment. I reminded her of how many times I had approached her about signing off on the requisition and that her failure to sign the requisition had caused the delinquency and inquired of her what else could I have done? She then retorted, "You could have said more." She then brought forth a memo asking me to sign it saying that it was a follow-up on our "counseling session" of May 10, 2007. (*For the record, there was no counseling session on May 10th or any other time and she knows it. I don't know what you would call what she did but she extracted certain duties from a position description and began stating that I didn't do this or I didn't do that and that was unacceptable. It was really strange listening to her site things in the position description that I had not done yet. I suppose that could be true of everyone who works for the government*). I told her that I was not going to sign anything without reading it and that it was already past my time to leave. I immediately advised her that I wanted a witness since I had filed an informal grievance against her. She said that I could not have one and that I had to sit there and listen to what she was saying. I repeated my request for a witness. When she denied me I said that I was leaving. She said that I was not going anywhere and she got up and blocked me from leaving. I was terrified but tried not to show it and insisted that she let me out. She then said that I was being insubordinate so I backed away from the door since she was refusing to let me out and she seemed out of control. She finally moved from the door so that I could leave. I was very shaken by this incident and a friend assisted me and brought me home. I had never had anything of this nature happen to me before and I was visibly shaken. I felt threatened in light of the atmosphere under which I have been working. Even the Director of the EEO boasted at a staff meeting just a few weeks ago of how she actually had a fist fight on one of her jobs prior to her coming here. Thus I had no one to turn to for help when she held me up in her office and refused to let me out. I was relieved to find David still there and he assisted me home as he had overheard me asking that she please let me out! As it stands now, I feel that I am in danger and need to be removed from the EEO office immediately or put on administrative leave until Rick Silva resolves the grievance that I discussed with him on Tuesday, June 5, 2007, against Lori Bledsoe, my immediate supervisor.

I believe now that the budget discussion was only a pretext for getting me alone so that she could manufacture some evidence and carry out her plan to cover up for all of the agency violations she has committed against me. I also believe that she was intentionally badgering me so that she could claim that I was insubordinate. I further believe that her assault of my personal space against me, and holding me hostage in that manner was unlawful and bordering on criminal behavior. I fear and have reason to believe that she may attempt other such behavior again or even worse given the opportunity.

It is now 11:00 PM and I am unable to sleep because of this incident.  I must remember to ask Mr. Silva whether the agency has representatives for employees in my situation, ie, the lawyer named Rhonda Baird who works on the 3rd floor.  Also need to know what one does when being accosted as I was today.  Do you call the security guards or outside police or just what should I do?


Rixene  Hicks



## PBGC

**Protecting America's Pensions**

### Pension Benefit Guaranty Corporation

1200 K Street, N.W., Washington, D.C. 20005-4026

To:     Rixene Hicks
Administrative Specialist

Stuart Bernsen
Designated Representative

From:   Stephen Barber
Chief Management Officer

Subject:    Step Two Grievance Decision

This memorandum is in response to your July 24th memorandum and the subsequent discussion held in my office regarding your grievance. I have considered the points you and your representative made in our discussion and have thoroughly read the documentation provided.

For the reasons stated below I have found your portrayal of events to have some credibility and therefore I am granting your remedies in part. From all of the evidence before me I have come to the conclusion that there appears to be a marked change in how your performance was viewed by your supervisor within a short period of time.

Specifically, prior to May of 2006, when you were hired into your present position, you were detailed to the Equal Opportunity Employment Office (EEO) for over 12 months. Your performance during that period must have been acceptable as you were competitively selected for a career ladder position within that office. Subsequent to your permanent assignment, you received a Quality Step Increase and an Outstanding rating for your performance at the end of fiscal year 2006. It appears that once the selection and entry on duty was effected for the new Director of EEO, the assessment of your performance dramatically changed. This change appears to be linked largely to the non-payment of several invoices that were submitted to the EEO Office, which were not processed in a timely manner. It is my opinion that while you had the responsibility for processing those payments, you took the necessary actions of informing your supervisor of issues concerning those invoices and that management intervention was necessary, but for reasons unknown to me, was not taken.

Your July 24 memorandum to me, Step Two Grievance (attached) identified 13 remedies. I am addressing all remedies as follows:

You are hereby offered a six month detail to BAPD as a Pension Analyst, GS-9. The evidence before me does not support that you qualify for a GS-11 Pension Analyst as you have requested. Therefore, this detail will provide you with an opportunity to learn skills associated with that position. After six (6) months, an assessment will be made by your BAPD manager as to

whether you have the abilities to succeed as a permanent Pension Analyst and whether you have attained the level of skills necessary to comfortably perform the duties and responsibilities of the GS-11 grade for permanent placement

At this time, I find no reason for retroactive promotion to the GS-11 position. The documentation provided by both you and your supervisor does not substantiate that your skills and abilities have progressed to the GS-11 level.

You have requested reparation of costs associated with any and all medical treatment. You have been approved for the leave donation/transfer program which has provided you with at least 40 hours of leave to enable you to continue to receive pay with the least interruption to the loss of your regular wages. However, in consideration of the totality of events that have recently transpired along with the fact that you have provided sufficient medical documentation from a competent physician verifying that you have suffered emotional stress attributed to your working environment I find that you should be compensated for any lost days up until the time that you returned to full duty, which have not been covered by the donated/transferred leave not to exceed 135 hours of the use of sick leave.

I cannot demand a written apology from your supervisor as you requested. However, after your work has been assessed by your prospective BAPD manager to be at an acceptable level and you are appointed to a permanent position outside the EEO office, any and all documents relating to the recent events that transpired while working in the EEO office provided by your supervisor, in which you are aggrieved, will be removed from your file.

Ms. Hicks, I recommend you give serious consideration of these remedies provided and start fresh with the new opportunity offered. You have been a valuable employee to PBGC. I have no doubt that in the future you will continue to be as valuable to the Corporation as you have been in the past. Putting this situation behind you will allow you to move ahead without the burdens of the last few months.



**PBGC** Pension Benefit Guaranty Corporation
Protecting America's Pensions    1200 K Street, N.W., Washington, D.C. 20005-4026

October 4, 2007

TO:         Rixene Hicks

FROM:       Arrie Ethridge
            Deputy Director, Human Resources Department

SUBJECT:    Investigation Conclusions


This is to inform you of the investigation conclusions reached regarding the allegations you made against your immediate supervisor, Lori Bledsoe.

By written complaint dated June 6, 2007, you brought to the attention of HRD an alleged incident that occurred during a meeting between you and Ms. Bledsoe in Ms. Bledsoe's office on that same date. In your complaint and during the investigation, you alleged that you told Ms. Bledsoe several times that you wanted to leave her office, but that she "blocked" you from leaving and said you were being "insubordinate" when you refused to sit down and sign a counseling memorandum. You stated, among other things, that while standing within an arm's length of you, Ms. Bledsoe, who was in a "rage," yelled and screamed at you to sit down, and physically blocked the door to prevent you from leaving.

The investigation concluded that you told Ms. Bledsoe you wanted to leave her office several times, and while standing within close range of you, Ms. Bledsoe gave you a direct order to sit down several times, noting that failure to comply would amount to insubordination. Your voices were loud enough to be heard from behind the closed door by one co-worker who was standing outside Ms. Bledsoe's office. However, because there were no eye-witnesses, it was not possible to substantiate your allegations that Ms. Bledsoe was in a rage or deliberately blocked the door to prevent you from leaving. Even if those allegations had been established, there would not be sufficient facts to rise to the level of actionable harassment under the law because the conduct does not appear to be based on any protected category (e.g., race, color, sex, age, gender, religion, disability, reprisal). Moreover, the incident is not sufficiently "severe or pervasive" to satisfy the legal definition of harassment. Management has, however, addressed the incident with Ms. Bledsoe, including the standards of conduct expected of all PBGC managers.

If you experience any further incidents with Ms. Bledsoe or anyone else, or if you experience any retaliation, please contact Ruben Moreno (ext. 3170) immediately.

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

RIXENE WINETTE HICKS,
                Appellant,

    v.

PENSION BENEFIT GUARANTY
    CORPORATION,
              Agency.

DOCKET NUMBER
DC-0752-07-0807-I-1

DATE: November 7, 2007

Stuart E. Bernsen, Esquire, Rockville, Maryland, for the appellant.

Scott Sadler, Washington, D.C., for the agency.

**BEFORE**
Sherry A. Zamora
Administrative Judge

## INITIAL DECISION

On August 2, 2007, the appellant filed an appeal alleging that she had been subjected to a constructive suspension for more than 14 days. Appeal File (AF), Tab 1. For the following reasons, the appeal is DISMISSED for lack of Board jurisdiction.

## BACKGROUND

Effective May, 2006, the appellant was appointed to the position of Administrative Specialist, GS-9, in the Equal Employment Opportunity office of the Pension Benefit Guaranty Corporation (PBGC). On August 2, 2007, the appellant filed an appeal alleging that, effective July 4, 2007, she had been constructively suspended from employment. AF, Tab 1. The appellant argued

that she was subjected to enforced leave in that she was involuntarily indefinitely suspended from Federal employment. *Id.* As it appeared that the Board may lack jurisdiction over the appellant's appeal, the appellant was informed of the applicable burden of proof and was afforded the opportunity to show cause why the appeal should not be dismissed. AF, Tab 5. The appellant filed a response. AF, Tab 7. The agency submitted its file and moved to dismiss the appeal for lack of jurisdiction. AF, Tabs 8[1] and 9. All submissions from both parties have been fully considered herein.

## ANALYSIS AND FINDINGS

The Board's appellate jurisdiction is limited to those matters specifically conferred on it by statute or regulation. 5 U.S.C. § 7701(a). *See Saunders v. Merit Systems Protection Board*, 757 F.2d 1288, 1290 (Fed. Cir. 1985). The appellant bears the burden of proof, by preponderant evidence, to establish that the alleged action is within the Board's jurisdiction. 5 C.F.R. § 1201.56(a)(2)(i). *See Bravman v. Department of the Navy*, 26 M.S.P.R. 169, 171 (1985).

It is undisputed that the appellant was absent from duty beginning June 20, 2007, through July 16, 2007. AF, Tab 7, page 10; Ag. File, Tab 1, Page 4. As the parties were advised in the show cause order, AF, Tab 5, an employee's voluntary absence from work is unappealable. *See Sherrod v. Department of the Navy*, 90 M.S.P.R. 327 (2001). However, an employee's absence for more than 14 days that results in a loss of pay may be a constructive suspension appealable to the Board under 5 U.S.C. §§ 7512(2) and 7513(d). An appellant who asserts a constructive suspension claim must establish by preponderant evidence that her absence was involuntary. *See* 5 C.F.R. § 1201.56(a)(2). *See also Tedesco v. Department of the Air Force*, 90 M.S.P.R. 367, 371 (2001); *Baker v. U.S. Postal Service*, 71 M.S.P.R. 680, 692 (1996).

---

[1] The agency file is found at this tab in the appeal file.

The appellant states that, on June 6, 2007, she had a meeting with her supervisor, Lori Bledsoe, in the EEO office,[2] during which the appellant's performance was discussed.[3] AF, Tab 5. The appellant contends that, during this meeting, she was physically threatened and assaulted. *Id.* Specifically, the appellant alleges as follows: Ms. Bledsoe informed her that she needed to sign a memorandum regarding a performance issue but the appellant refused to sign it without having adequate time to read it and without having a witness present. *Id.* at page 7. The appellant asserts that she stood to leave but her supervisor "hollered" at her to sit down. *Id.* The appellant stated that she proceeded to approach the door and had her hand on the door knob in order to open the door but Ms. Bledsoe put her hand over the appellant's hand and prevented the appellant from opening the door. *Id.* at pages 7-8. The appellant contends that she "pleaded" with her supervisor to allow her to leave but that Ms. Bledsoe screamed at her and repeatedly demanded that she sit down. *Id.* at page 8. The appellant asserted that her supervisor "kept pointing and yelling saying [she needed] to shut up and [sit] down." She stated that Ms. Bledsoe was "in a rage and out of control" and that her "veins were bulging and her eyes were red and popping." *Id.* The appellant asserted that Ms. Bledsoe was "foaming and saliva was flying in [her] face." *Id.* The appellant indicated that she sat down,

---

[2] The agency asserts without dispute that the EEO office is located on the 10th floor. AF, Tab 9, Page 4.

[3] I note that, in her response to the show cause order, the appellant included a timeline of the alleged events. AF, Tab 7, page 10. In that timeline, the appellant indicates that June 5, 2007, was the date of the alleged "assault." However, in her narrative response in the same pleading, the appellant indicated that the event occurred on June 5, 2007. *Id.* at page 6. This was clearly a typographical error as the appellant also referred to another communication with agency officials on the day prior which she identified as June 5, 2007. *Id.* The remainder of the appellant's submissions are consistent that the alleged incident occurred on June 6, 2007. For instance, in her complaint to the agency made contemporaneously with the alleged incident, the appellant indicates that the incident occurred on June 6, 2007. Ag. File, Tab 4K.

Ms. Bledsoe seemed to calm down and, after making copies of relevant documentation, she allowed the appellant left her office. *Id.* The appellant indicated that the meeting lasted approximately eight minutes. *Id.*

The appellant indicated that Ms. Bledsoe's actions constituted a verbal and physical attack which left her very fearful. *Id.* at page 9. She stated that she could not sleep that night and did not want to return to work. *Id.* However, it is undisputed that the appellant did return to work the next day, Thursday, June 7, 2007, and reported the incident to Ricardo Silva in the agency's Human Relations Division (HRD). *Id.* Subsequently, Ruben Moreno, Director, HRD, arranged for the appellant to work in a cubicle on the 4th floor of the agency, in the agency's Facilities and Services Department (FASD), for the remainder of that day. *Id.* at page 10. The appellant further states that she reported to work on Friday, June 8, 2007, where she worked both in the EEO office and in FASD. *Id.* The appellant stated that Ms. Bledsoe was not present on that date when she completed the payroll for the EEO office. *Id.* The appellant further indicated that she returned to work on Monday, June 11, 2007, and worked in FASD, and, on June 12, 2007, she reported to the EEO office as directed. *Id.* She indicated that Mr. Silva had escorted her to the EEO and assured her safety. *Id.* The appellant stated that she had begun experiencing pain after the incident with Ms. Bledsoe and that this pain was increasing. *Id.* She indicated that she saw a physician on June 13, 2007, and on June 15, 2007. *Id.* However, on the other dates, June 12, 14, 18, and 19, she reported to the EEO office. *Id.* at pages 10-11. The appellant indicated that Ms. Bledsoe was absent at all times when she reported to work in the EEO office. *Id.* The appellant made no allegations that she was required to work with or for Ms. Bledsoe subsequent to the incident nor did she allege any intolerable working conditions in the EEO office when working there subsequent to the alleged incident. Nonetheless, on June 20, 2007, the appellant again visited her physician. *Id.* at page 11. The appellant asserts that she was unable to return to work from that date through July 16, 2007. *Id.* On July 17, 2007, she

reported to HRD where she was provided a cubicle until she was detailed to another office beginning on July 23, 2007. *Id.* The appellant stated that she notified agency officials of "intolerable working conditions" in documentation, including a grievance, filed from May through August, 2007. *Id.* at pages 11-12.

The appellant asserted that the "thought of reporting to the EEO Office became increasingly unbearable." *Id.* at page 11. The appellant appears to allege that her absence from June 20, 2007, through July 16, 2007, was the result of intolerable working conditions. AF, Tab 5.

The Board has held that, when an agency makes an employee's working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign or retire, the resignation or retirement may be involuntary. *See Gerges v. Department of the Navy*, 89 M.S.P.R. 669, ¶ 7 (2001); aff'd, 52 F. App'x 513 (Fed. Cir. 2002); *Markon v. Department of State*, 71 M.S.P.R. 574, 577 (1996); *Heining v. General Services Administration*, 68 M.S.P.R. 513, 520 (1995). In *Peoples v. Department of the Navy*, 83 M.S.P.R. 216, 219-20 (1999), it applied the same standard in determining whether an agency's actions had caused an employee's absence to constitute a constructive suspension. As the Board notes in *Gerges*, "the involuntariness standard stated in *Peoples* and [subsequent cases] is a high one, and ... requires the courts and the Board to focus on whether the agency 'render[ed] the workplace so pervasively unpleasant and difficult' that the employee was 'deprived .... of any other choice but to quit." *See Gerges*, 89 M.S.P.R. at ¶ 9, *citing Heining*, 68 M.S.P.R. at 522. Thus, the appellant must establish that her working conditions essentially left her devoid of any reasonable choice other than to remain away from the workplace.

In this case, it is undisputed that the appellant reported to the agency for work the day after the incident. Although she apparently took leave for medical appointments subsequent to that time, the appellant asserts that she was unable to return to duty beginning on June 20, 2007. AF, Tab 5. Thus, the appellant was apparently able to work for approximately 14 days after the alleged incident.

Further, the appellant makes no allegations that she was subsequently directed to work with or for Ms. Bledsoe. Rather, the agency asserts that, upon being advised of the alleged incident on the day after it occurred, it immediately took steps to allay the appellant's concerns about working in close proximity to Ms. Bledsoe. AF, Tabs 8 and 9. The agency noted that agency officials immediately moved the appellant to a work station which was located six floors away from Ms. Bledsoe in FASD, and that it instructed the appellant to perform duties in the EEO office only when Ms. Bledsoe was not at the agency's premises. *Id.* The representations from both parties are completely consistent on these facts. The parties are further consistent regarding assertions that, upon her return to work, the agency provided the appellant with a detail to another office. AF, Tab 5, Page 11; AF, Tab 9, Page 6. The agency asserts without dispute that the appellant's detail has continued until this time. Ag. File, Tab 1, Page 5.

In her written complaint to the agency, which the appellant indicates was written on June 6, 2007, the appellant requested that she "be removed from the EEO office immediately or put on administrative leave..." Ag. File, Tab 4K, Page 1. It appears that the agency essentially met the appellant's demands. Although it is undisputed that the agency directed the appellant to perform some duties in the EEO office subsequent to the alleged incident, it is further undisputed that Ms. Bledsoe was not present. The appellant makes no allegations of intolerable working conditions while working in the EEO office subsequent to the incident when Ms. Bledsoe was not present at the workplace. There are no allegations that the agency ever required the appellant to work with Ms. Bledsoe subsequent to the incident and, in fact, it is undisputed that the agency provided the appellant with working locations as well as a position outside of the EEO office.

It is well established that, where an employee voluntarily initiates their absence, it cannot be deemed a constructive suspension. *See Slocum v. U.S. Postal Service*, -- M.S.P.R. --, ¶ 10 (MSPB Docket No. AT-0752-07-0157-I-1)

(October 26, 2007); *Mills v. U.S. Postal Service,* 106 M.S.P.R. 441, ¶ 6 (2007); *Alston v. Social Security Administration,* 95 M.S.P.R. 252, ¶ 11 (2003), *aff'd,* 134 F. App'x 440 (Fed.Cir.2005). In this case, there is nothing to indicate that the agency initiated the appellant's absence. There is insufficient evidence to establish that the appellant's working conditions were rendered so intolerable that a reasonable person would determine that she had no choice but to absent herself from the workplace. The appellant demonstrated her ability to work subsequent to the alleged incident as she continued working for approximately two weeks prior to her extended leave. Further, the agency worked diligently to address the appellant's concerns about working with Ms. Bledsoe and provided her with multiple accommodations to avoid the appellant returning to work for or with Ms. Bledsoe subsequent to the alleged incident. These accommodations have continued despite the findings of the agency's investigation that no harassment from Ms. Bledsoe toward the appellant could be substantiated. Ag. File, Tab 4A. Thus, in sum, the appellant clearly had the option of continuing to return to work subsequent to the incident with the accommodations provided by the agency.[4]

The appellant requested a hearing in this matter. AF, Tab 1. In the case of an alleged constructive suspension, the appellant is entitled to a hearing on the issue of Board jurisdiction only if she makes a non-frivolous allegation that, if proven, could establish that she was constructively suspended. *See Mills,* 106 M.S.P.R. at ¶ 6; *Burgess v. Merit Systems Protection Board,* 758 F.2d 641, 643 (Fed.Cir.1985); *Hamiel v. U.S. Postal Service,* 104 M.S.P.R. 497, ¶ 5 (2007).

---

[4] I note that the appellant provided copies of medical treatment slips showing that she did receive medical attention subsequent to the incident and during her absence. AF, Tab 5. There is little medical information in these treatment slips and there is no indication that the treatment was the result of the alleged incident. Moreover, it is undisputed that the appellant was provided sick leave for these absences. In fact, the agency asserted that it restored some of the appellant's sick leave. Regardless, the fact that an appellant utilizes sick leave for a period of time is alone insufficient to establish that a constructive suspension resulted.

I find that the appellant failed to meet this threshold requirement and, accordingly, that she is not entitled to the hearing she requested.

Finally, I note that the appellant raised several affirmative defenses including harmful procedural error, prohibited personnel practices, violations of law, discrimination, and retaliation for protected disclosures.  AF, Tab 1. However, it is well established that the Board has no jurisdiction over affirmative defenses absent an otherwise appealable matter.  *See, e.g., Hardy v. U.S. Postal Service*, 72 M.S.P.R. 71, 74 (1996), *aff'd*, 114 F.3d 1207 (Fed. Cir. June 12, 1997) (Table); *Swango v. Department of Veterans Affairs*, 59 M.S.P.R. 235, 241 (1993); *Daneshpayeh v. Department of the Air Force*, 57 M.S.P.R. 672, 682 n. 9 (1993), *aff'd*, 17 F.3d 1444 (Fed.Cir.1994) (Table); *Booker v. U.S. Postal Service*, 53 M.S.P.R. 507, *aff'd*, 982 F.2d 517 (Fed. Cir. 1992); *Caballero v. U.S. Postal Service*, 34 M.S.P.R. 263, 266 (1987).

**DECISION**

The appeal is DISMISSED.

FOR THE BOARD:

Sherry A. Zamora
Administrative Judge

**NOTICE TO APPELLANT**

This initial decision will become final on ___DEC 1 2___, unless a petition for review is filed by that date or the Board reopens the case on its own motion.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  You must establish the date on which you received it.  The date

on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the

determined by the postmark date. The date of filing by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

> The United States Court of Appeals
> for the Federal Circuit
> 717 Madison Place, NW.
> Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail

Rixene Winette Hicks
12600 Gable Lane
Fort Washington, MD 20744

<u>Appellant Representative</u>

U.S. Mail

Stuart E. Bernsen
NAGE, Local R3-77
10719 Kings Riding Way #102
Rockville, MD 20852

<u>Agency Representative</u>

U.S. Mail

Scott Sadler, Esquire
Pension Benefit Guaranty Corporation
Office of General Counsel
1200 K Street, N.W.
Washington, DC 20005-4026

_____November 7, 2007_____
(Date)

Latisha Clinton
Legal Assistant

DATE:        December 10, 2007                                    1 of 2 pgs


TO:          United States of America
             Merit Systems Protection Board
             Alexandria Office
             **ATTN: Administrative Judge Sherry A. Zamora**


FAX:         (703) 756-7112

FROM:        Rixene Hicks        Docket No. DC-0752-07-0807-I-1

PHONE:       (301) 292-4876

United States of America
The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW
Washington, DC 20419

December 10, 2007

Rixene W. Hicks
12600 Gable Lane
Fort Washington, MD 20744

Docket No. DC-0752-07-0807-I-1

Sherry A. Zamora, Administrative Judge

Dear Judge Zamora,

In response to your dismissal of my case number DC-0752-07-0807-I-1 on November 7, 2007, I bring to your attention and want the record to show that your decision to dismiss my case without a Hearing was based on at least 2 false premises advanced by my agency, Pension Benefit Guaranty Corporation with Scott Adler as the attorney representing the agency.  They are:

1) The date I filed my informal complaint was not June 20, 2007; it was May 30, 2007. My supervisor was required to respond to the informal complaint by June 20, 2007 but she chose not to after she requested and was given 2 extensions within that time frame. May 30 through June 20th, in which to do so, and 2) not all of my leave taken resulting from the injury I sustained on June 6, 2007 was restored.  The agency used 64 hours of annual leave, related to this injury and that has not been restored.

If I had been granted a Hearing, as I anticipated, I would have been able to point this out. I am submitting this for the record within the timeframe for an appeal and respectfully ask that you review this aspect of the case with a view toward correcting this error in the record. Further, if this corrected information is sufficient basis for you to reverse your decision, I respectfully ask you to do so and would appreciate you taking whatever steps are necessary to make this right and advise me, or my counsel of record accordingly.

Thank you for your cooperation.

Sincerely,

Rixene Hicks

Cc: Stuart Bernsen
Scott Sadler

Sent via fax  (703) 756 7112        Date:  December 10, 2007

**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-254-3600

JAN 3 1 2008

Mrs. Rixene Hicks
12600 Gable Lane
Fort Washington, MD 20744

Re: <u>OSC File No. MA-08-0347</u>

Dear Mrs. Hicks:

This letter responds to your complaint to the U.S. Office of Special Counsel (OSC) against the Pension Benefit Guaranty Corporation. In your complaint, you allege that you have been retaliated against for whistleblowing and for engaging in protected activity. We have carefully reviewed your complaint. We have, nevertheless, based on our evaluation of the facts and law applicable to your circumstance, made a preliminary determination to close our inquiry into your allegations.

The U.S. Office of Special Counsel is authorized to investigate allegations of prohibited personnel practices and activities prohibited by civil service law, rule, or regulation. 5 U.S.C. § 1214(a)(1)(A), 1216(a) and 2302(b). The Special Counsel presents allegations of prohibited personnel practices to the Merit Systems Protection Board (the Board) which has the authority to hear and adjudicate such claims.

The provisions of 5 U.S.C. § 2302 establish that our authority to investigate prohibited personnel practices extends only to employees or applicants for employment to competitive or excepted service positions in Executive Branch Departments and agencies of the federal government. An agency, as defined by 5 U.S.C. § 2302(C), does not include Government corporations, except for allegations of reprisal for whistleblowing 5 U.S.C. § 2302(b)(8). Thus, because you are an employee of a Government Corporation, we do not have jurisdiction over your allegation of reprisal for protected activity (filing grievances), a violation of 5 U.S.C. § 2302(b)(9).

In your complaint, you assert that you suffered various adverse personnel actions after you made several disclosures between February 2007 and July 2007. Specifically, you disclosed that your supervisor, Ms. Lori Bledsoe, refused to take steps to put a contract in place to cover services for the hearing impaired. You also disclosed to Serena Watters, HR Student Program Coordinator, that the EEO Director, Stephanie Holder, was paying a part time student full time wages. Finally, you assert that you made a protected disclosure when you reported Ms. Bledsoe for trapping you in your office and assaulting you.

Under the Whistleblower Protection Act of 1989 (WPA) it is a violation of 5 U.S.C. § 2302(b)(8) to take or fail to take, or to threaten to take or fail to take, a personnel action with respect to any employee because of any disclosure of information by an employee which the

**U.S. Office of Special Counsel**
Mrs. Rixene Hicks
Page 2

employee reasonably believes evidences: (1) a violation of law, rule or regulation; (2) gross mismanagement; (3) a gross waste of funds; (4) an abuse of authority; or (5) a substantial and specific danger to public health or safety, if such disclosure is not specifically prohibited by law, or specifically required by Executive Order to be kept secret.

In order for OSC to establish a violation of 5 U.S.C. § 2302(b)(8), we must be able to show: (1) you made a "protected disclosure" of information, (2) a personnel action was taken, not taken, or threatened, (3) the official who took, failed to take, or threatened the personnel action knew about your "protected disclosure," and (4) the official took, failed to take, or threatened the personnel action because of your "protected disclosure."

You allege that in retaliation for whistleblowing you were denied a promotion, detailed, suspended, relieved a your time keeper job duties, and received a negative performance review. As stated above, to prove a violation of section 2302(b)(8), you must show that the agency took a personnel action against you.

Personnel actions are listed at 5 U.S.C. § 2302(a)(2)(A) and include actions such as promotions, details, and suspensions. In addition, while yearly performance evaluations are personnel actions, mid-year performance reviews, such as you describe, do not qualify as personnel actions under this statute.

Furthermore, though you state that you experienced a change in duties following your disclosures, there is insufficient information to prove that this action constitutes a personnel action. In order for a change in duties to meet the statutory definition of personnel action defined by 5 U.S.C. § 2302(a)(2)(A), the change must be "significant." Webster's dictionary defines significant as "a noticeably or measurably large amount." While you claim that after you reported that the student worker was being paid full time wages for part time work, your duties as time keeper were changed so that the student no longer submitted her hours to you, you have failed to provide any information to show that this change resulted in a "significant" change in your duties. Thus, we are unable to review your alleged change of duties or midyear review as actions that were issued in retaliation for whistleblowing.

We are also unable to review the details surrounding your suspension to determine if this action was taken in violation of section 2302(b)(8). First, it appears that the agency never issued you a notice of proposed suspension. Instead, you assert that because the agency charged you with AWOL while you were using sick leave, you were "constructively" suspended. The proper corrective action for such violations is to compel the agency to reinstate your leave and reimburse you for any leave without pay you may have accrued. Information obtained from the agency, however, indicates that all the leave taken from you during the period in question has been restored. Thus, because the agency has already restored your leave, in effect correcting the possible violation, we are unable to provide you with relief in this matter.

**U.S. Office of Special Counsel**
Mrs. Rixene Hicks
Page 3

We did, however, review the circumstances of your complaint to determine whether you were detailed or denied a career ladder promotion in violation of sections 2302(b)(8). To prove retaliation for whistleblowing, the employee must show evidence of causation. In other words, the employee must show that the personnel actions, here a detail and the denial of a promotion, occurred because the employee made a protected disclosure. You have provided no information, however, besides your belief, to link the complaints you made about your supervisors to your detail and non-promotion. Specifically, the detail you were assigned to in July was requested by you and a result of the agency's response to a grievance you filed. Thus, the detail was not issued in order to retaliate against you. In addition, you have failed to provide any information to show that you did not receive your promotion do to the disclosures you made prior to May 30, 2007. In fact, there is no information to suggest that your supervisor, Lori Bledsoe, was in any way affected or disciplined due to your disclosures, and thus had a motive to retaliate against you because of them, or that a statement of animus was made against you because of your reports about her and the Director. Consequently, without any information to show that your non-promotion was a retaliatory action, we are unable to further pursue this allegation.

As previously stated, we have made a preliminary determination to close our inquiry into your complaint. You have, however, an opportunity to submit comments concerning our determination. Your response must be *in writing* and should address the reasons we cited in reaching our preliminary determination to close your complaint. You have *thirteen days from the date of this letter* to submit your written response. If we do not receive any written comments by the end of the thirteen-day period, we anticipate closing the file. We will then send you a letter terminating the investigation and advising you of any additional rights you may have.

Sincerely,

Maria Davis
Attorney
Complaints Examining Unit

February 11, 2008

Maria Davis
US Office of Special Counsel
1730 M Street NW, Suite 213
Washington, DC 20036-4505

Re:    OSC File No. MA-08-0347

Dear Maria Davis:

On Monday, February 4, 2008, I received your letter dated January 31, 2008. I feel
pressured to respond to you by February 12, as you have required because I am still
without any legal representation and I am uncertain about how to respond. I do have a
few questions to ask as to the process and how you operate as a matter of standard
procedure. For example, in conducting your fact-finding or inquiry into my complaint,
may I know from you, to whom you have spoken or contacted in the PBGC Corporation?
Have you requested any documents from anyone in the agency? Some of the things I
have alleged and of which I am aware, were spoken and may not have been put in
writing. That being the case how would you as the investigator determine or validate
what I have said? I had reason to believe that when I made my complaint to OSC,
someone from your office would conduct an on sight investigation and put those whom I
have complained about under oath and/or take sworn statements. If you can respond to
these few questions or speak to these concerns, it would be of great assistance to me in
helping me to protect and defend my rights until I have secured legal representation.

In the meantime, in an effort to show that I believe in the merits of my case and to meet
your demands for a response by February 12, 2008, I am responding to your letter as best
as I can. I must rely on you to do what is just and to ask that you please look further into
my allegations. I believe that I have been and continue to be, retaliated against
subsequent to my blowing the whistle on my supervisors, Lori Bledsoe and Stephanie
Holder, regarding the invoices, the part time students work hours and pay, and the
unlawful and criminal attack on me of June 6, 2007. Moreover, I believe that the agency
is now actively involved in carrying out this continuation of retaliation. Below at Part 1,
is my commentary, connecting in part what has happened to me, directly to the
whistleblowing, followed by Part 2, Special Comments/Questions along with certain
supporting Exhibits, including some explanation.

**Part 1. In answer to your inquiry as to why I believe that my supervsior's actions
are directly related to my reporting what was going on in the EEO Office.** Prior to
February 07, I had enjoyed a productive and successful career at PBGC, including the
nearly 3 years in the EEO office and had been rewarded on a regular basis. In February
07, after reporting to contracts and procurement why the invoices were not being paid
and after reporting what Stephanie Holder was doing in violation of the employment

**rules covering the part time** student, the atmosphere in the office became increasingly more tense and hostile, **culminating in a threat of disciplinary action on May 4th**, executing the first step of that threat on May 10th, Lori Bledsoe denying me my promotion on May 30th **and** ultimately holding me hostage on June 6, 2007, while attacking me and trying to blame me for her failed responsibilities regarding the invoice fiasco. From the beginning, neither manager wanted to do a ratification to get a contract in place so the invoices could be paid. Lori Bledsoe wanted Stephanie Holder to do it since she got the job promotion, but Stephanie would not do it. Neither of them would sign off on the required requisition that I initiated. When I told them what was required, Stephanie Holder's reaction was that she would not do it but would seek to get the program moved to another office. That is was too much work for the EEO office. They stalled thinking they could transfer the program and its problems. to the next office. There is no written proof of what they said and their attitudes about this invoice problem, but that is what happened. There is evidence that they sought to have the program moved because of various meetings they began to have on the subject in March and April. There is also evidence that they did not sign the requisition that would have resulted in having a contract in place. They eventually had to do a ratification in late May 07, which I initiated, but it was not put in place until June 07. By then, more than $86,000 in invoices had accrued without having a contract in place to pay for the Interpreter services. Whether this constitutes gross mismanagement or abuse of authority over appropriated funds or a violation of law, is up to you and the law to decide, but for Ms. Bledsoe to try and frame me for this violation of law, even willing to risk physical force and injury to me, appears to me to be criminal in nature, a gross abuse of power and could only stem from the whistleblowing. Yet the agency Chief Management Officer, Stephen Barber, said on August 31, 2007, that the attack was her "first offense". This comment was made to me and to Stuart Bernson. Also see Exhibit C

As to being reassigned and or detailed to a different office... while I did ask for a reassignment to a different office out of fear after I was viciously attacked, it would have been even more irresponsible and cruel if agency officials had forced me to continue working in the EEO office under the same person (s) who had committed the assault and battery on me. Indeed, as soon as I reported the incident on the morning of June 7, 2007, to agency leaders in the Human Resource Division, Ruben Moreno and Ricardo Silva, they took steps and moved me immediately to a different floor and I was told that Ms. Bledsoe would not come in contact with me again, that she was working from home. I understand that my memorandum reporting this attack was given to Stephanie Holder and she sought advice immediately from the General Counsel's office. Further, upon reporting the attack of June 6, the agency undertook an investigation, although they never gave me an official report of what was said by those who had been interrogated. A copy of the agency's response to the investigation is listed under Part 2, Exhibit J.

Respecting a change in duties.... I had been interviewed and hired to perform EEO counseling duties 85-90 percent of my time with the part time student that I interviewed and recommended his hire, to assist in the routine administrative duties. Nothing related to the budget was ever discussed with me during the interview for the position. This

worked fine until after I revealed the issues over the invoices in or around February 07 and the way Ms.. Holder was handling the part time student's leave. All of my counseling duties were removed and I was assigned fulltime duty over invoices and budget related activity, even those duties like program projections and long-range strategic planning, things that were normally performed at the management levels of GS/14 and above. Ms. Holder also removed my responsibilities for direct contact with the staff in recording leave taken. Instead she collected the leave slips and then gave to me to record, completely different from how we had previously operated. This information can be corroborated by interviewing, Stephanie Holder, Lori Bledsoe, and David Williams, and by reviewing position descriptions and objectives of managerial positions.

### Part 2. Special Comments/Questions and Various Exhibits in Support of the Above Commentary

Need clarification on your statement regarding the jurisdiction over protected activity, involving reprisal stemming from a grievance, because of PBGC being a corporation versus a government agency.

What if PBGC Corporation adopts same laws as governmental agencies to follow within the corporation? Also what if complaint to MSPB also alleged unlawful discrimination? Is that covered by the law cited, 5 USC Section 2302(b)(8) and give you authority over this? Merit Systems never addressed my claims of discrimination. They limited their response to only 2 issues about leave and constructive dismissal.

On Disclosures of: 1) Lori Bledsoe's negligence in securing a contract for hearing impaired; 2) disclosure regarding violation of part time student's program, and 3) disclosure of violent retaliatory attack of June 6, 2007

See exhibit A, agenda of staff meeting held on May 4, 2007, wherein I was reprimanded and threatened with disciplinary action; listing insubordination as a topic; also see Statement from David wherein he discusses this same meeting and the hostile environment that began after I first advised Stephanie Holder and Lori Bledsoe of what they needed to do in order to be in compliance on the leave matter and on the invoice issue. First reported the problem(s) in February 07, See exhibit B, email dated February 23, 2007, wherein Serena Watters was addressing the student's hours. I was denied a promotion two weeks after being threatened in the presence of others at the staff meeting on May 4, 2007. See Exhibit B1, dated May 10, 2007 first attempt to establish a record of unsatisfactory work and the implications of non- performance.

I did not have a negative rating and no hint or mention of one until after the staff meeting of May 4, during an informal negative review on May 10, 2007, a few days after being threatened with disciplinary action of being fired. Lori Bledsoe failed to sign the Form

52, thus denying me the promotion. Lori Bledsoe did not give me a copy of the appraisal she used in 2006 to justify the quality step increase I received in December 06 for outstanding work. I did not receive an appraisal for 2007 after blowing the whistle on her. See absence of the appraisal in personnel folder or question Ms. Bledsoe.

See Exhibit...C, the CMO admitting in writing that Hicks allegations of retaliation have merit.

See Exhibit D, copy of requisition initiated by me dated November 24, 2006, seeking to obtain a contract to get the invoices paid.

Exhibit E, letter from me to Lori Bledsoe wherein I question her about my promotion and recorded her comments to me during an unscheduled visit of May 25, 2007. At my prompting, Stephanie Holder verbally advised me on May 30th that she agreed with Lori Bledsoe that I should not be promoted. Thus she was carrying out her threat of disciplinary action against me over the part time student issue. Also see, Stephanie's comments made during the first step formal grievance and the fact that Lori Bledsoe remained silent and has never defended her actions.

Exhibit F, Document from Lori Bledsoe dated June 6, 2007 reprimanding me, falsely accusing me of not paying backlogged invoices that she herself had allowed to accrue to an amount of $86,000 by refusing to sign the required requisition.

Exhibit G, Memorandum from me recorded on the night of June 6, 2007, about Lori Bledsoe's attack on me; reporting the criminal attack to agency officials on the morning of June 7, 07; seeking advice also on what to do, including calling the police. Also letting agency know that I feared Lori may try to attack me again and asked to be allowed to work from home out of fear, until they had conducted an investigation and settled the matter. Ruben Moreno said that there was no need for the police that they would handle it. Agency Witnesses: Ruben Moreno, Stuart Bernson, and Ricardo Silva. Other witnesses: David Williams, Terry Hicks, and John and Patricia Chiperas.


*Exhibit H,* Emails dated July 2006 from Hearing Impaired pleading with Ms. Bledsoe to get the invoices paid because of the embarrassment when not paid and the dire need for such services,

*Exhibit I,* a copy of draft Ratification dated March 27, 2007 mandated by Contracts in order to get the backlogged invoices paid,

*See Exhibit J,* agency decision of investigation into the attack of June 6, written by Etheridge, a new director of HRD, basically denying that the attack took place since there were no eye witnesses.

*See Exhibit K,* request for a restraining order filed in DC Superior Court after learning

that the agency's response to the investigation of the assault charge cleared Lori Bledsoe of any wrong doing because "there were no eye witnesses".

*Exhibit L,* Restraining Order moved to Federal Court, listing Tort and Personal Injury.

<u>Notes on Changes made in the agency since whistelblowing and after the attack:</u>

- The student is no longer working at PBGC, transcripts not produced as required.
- Stephen Barber told me, and my agency representative, Stuart Bernson that Lori Bledsoe would not harm me again and if she came near me, just to let them know. I was told that she had been assigned to work at home
- The agency statement form Etheridge states that Lori Bledsoe had been counseled regarding her unacceptable conduct. *See Exhibit J*
- The Interpreter Service Program was moved to another office.
- A Caucasian female attorney, one of the persons who investigated my assault and battery charge, has been reassigned to the EEO office over Stephanie's objection. Stephanie often stated she did not want "any whites in the EEO Office."
- The agency is under review because of massive complaints within the agency being handled by the EEO office.
- Stephanie has stated she will be retiring this year, according to the grapevine
- The agency is violating the law by refusing to submit a worker's compensation claim on my behalf, part of the ongoing retaliation because I reported on their EEO managers.
- The agency has not restored all of my leave and I cannot get a response from Wendy Cottrell on any leave question. (I have many communications on this)

Rixene Hicks
12600 Gable Lane
Fort Washington, MD 20744

U.S. Office of Special Counsel                           February 22, 2008
1730 M Street, NW, Suite 300
Washington, DC 20036-4505

Dear Maria Davis:

I write to provide you with additional documents related to my case, documents which may speak to some of your questions as to whether and/or how Ms. Bledsoe may have been punished following my exposing her wrongdoings. I also would like to add the comment that, to my knowledge, none of the facts that I have alleged regarding what Ms. Bledsoe did to me has ever been disputed by her.

One documents is a page taken from a letter or brief from Scott Sadler, an attorney in the General Counsels Office, responding to the complaint that went to the MSPB wherein he notes that immediately upon the attack of June 6 being reported, Ms. Bledsoe was sent home and would be working from home until the investigation was completed.

In addition, I am sending you 2 memorandums from me to MSPB and copied to Mr. Sadler, correcting some of the misstatements, although there were others in his writings, that had been sent forth by Mr. Sadler to MSPB, when he responded to the complaint.

Further, because I believe that Ms. Bledsoe's actions towards me, and the manner in which the agency has handled the matter, have been criminal in nature, I am considering taking steps in federal court to resolve what they have done to me.

Kindly,

Rixene Hicks

Sent via fax ( 202) 653-5151  February 22, 2008

DATE:        December 18, 2007                          1 of 3 pgs


TO:          Merit Systems Protection Board
             Office of the Clerk of the Board


FAX:         (202) 653-7130

FROM:        Rixene Hicks - Docket No. DC-0752-07-0807-I-1
                             Rixene Hicks v. Pension Benefit Guaranty Corporation


PHONE:       (301) 292-4876


Comment:     I am sending the original in the mail.

December 18, 2007

United States of America
The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW
Washington, DC 20419

Rixene W. Hicks                          Docket No. DC-0752-07-0807-I-1
12600 Gable Lane
Fort Washington, MD 20744

To the Office of the Clerk of the Board,

After a more careful review of the agency's argument sent forward to MSPB, I discovered many more misstatements that were advanced by Scott Sadler, the agency's attorney, than what I originally thought. In addition to the two set out in my letter of December 11 and sent to MSPB, there were several others. It is just too many to let go unchecked lest they be considered as fact and show up somewhere else during another investigation. Even if the MSPB fails to modify its position, I want the record corrected to show that under "General Background" the following comments made by the agency, are not in line with the facts as supported by the record:

1) False- Agency states on page PBGC-1-2, "Ms. Bledsoe held one such meeting to discuss Ms. Hicks' performance on May 26, 2007."

**Fact/Truth:  There was no May 26, 2007 meeting, nor discussion of my performance.**

2) False. Page PBGC –1-3 "Ms. Hicks claims she placed her left hand on the doorknob to push it down and open it and Ms. Bledsoe placed her hand on top of hers."

**Fact/Truth: Ms. Hicks told all she had her right hand on the door handle and Ms. Bledsoe put her left hand on top of Ms. Hick's right hand.**

3) Mistatement. Page PBGC-1-3. "Ms. Hicks does not claim that Ms. Bledsoe called her an offensive name or threatened her with violence."

**Fact/Truth: There was definitely and unmistakenly a threat of violence intended. Ms. Bledsoe blocked the door and held me to prevent me from leaving. Ms. Bledsoe put her left hand on top of Ms. Hicks right hand that was on the door handle and stated, "you're not going anywhere. Ms. Bledsoe was yelling at me while pointing her finger in and out of my face, saying "You're not going anywhere". This was a threat of violence to me, implied or otherwise.  Bledsoe made it clear something bad was going to happen to me if I did not back away from her and do as she said. The time of day she elected to do this to me made it clear what she had planned. That's**

why it was reported to the agency the very next day and included in the grievance. See item IX Formal Complaint –Physical Assault, speaks of verbal and physical

4) False PBGC-1-4  "Ms. Hicks performed her regular work from the fourth floor workstation and only communicated via e-mail with Ms. Holder, PBGC's EEO Director and second line supervisor. Ms Hicks had no communications with Ms. Bledsoe."

**Fact/Truth:  Ms. Hicks communicated with Ms. Bledsoe and Ms. Holder on June 7th via e-mail.**

5) False. PBGC-1-5  "The complaint was received by PBGC's HRD on June 8, 2007."

**Fact/Truth:  My abbreviated report and complaint of the June 6 attack was hand delivered on the very next morning of June 7, 2007 to HRD. The date stamp is in error.**

6) False .PBGC-1-6 "Ms. Hicks also filed a first step formal grievance June 20 concerning events of June 6."

**Fact/Truth:  While it may have been the 1st step formal, the first informal date of the grievance was filed on May 30, 2007 with HRD.  The EEO Manager and the EEO Director were informed twice on May 30, 2007.**

7) Misstatement. PBGC-1-6  "In her grievance, Ms. Hicks sought among other things."

**Fact/Truth:  All remedies were not included.  Failed to address the following in whole. A written narrative appraisal to commend the work I've done; a written apology for the assault and enforceable agreement that Ms. Bledsoe remain a certain distance away from my person on and off the government premises; all and any potential cost, including any medical treatment, loss of wages or leave, associated with the high level of anxiety, which may arise from this grievance _and from the assault on Ms. Hicks person, all other relief that is just and proper._**

I hope you will take whatever steps are necessary to let the record be corrected. Thanks.

Sincerely,

*Rixene Hicks*

Rixene Hicks

Cc: Stuart Bernsen, Representative

DATE:        December 10, 2007                    1 of 2 pgs


TO:          United States of America
             Merit Systems Protection Board
             Alexandria Office
             **ATTN: Administrative Judge Sherry A. Zamora**


FAX:         (703) 756-7112

FROM:        Rixene Hicks        Docket No. DC-0752-07-0807-I-1

PHONE:       (301) 292-4876

United States of America
The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW
Washington, DC 20419

December 10, 2007

Rixene W. Hicks                    Docket No. DC-0752-07-0807-I-1
12600 Gable Lane
Fort Washington, MD 20744

Sherry A. Zamora, Administrative Judge

Dear Judge Zamora,

In response to your dismissal of my case number DC-0752-07-0807-I-1 on November 7, 2007, I bring to your attention and want the record to show that your decision to dismiss my case without a Hearing was based on at least 2 false premises advanced by my agency, Pension Benefit Guaranty Corporation with Scott Adler as the attorney representing the agency. They are:

1) The date I filed my informal complaint was <u>not</u> June 20, 2007; it was May 30, 2007. My supervisor was required to respond to the informal complaint by June 20, 2007 but she chose not to after she requested and was given 2 extensions within that time frame. May 30 through June 20th, in which to do so, and 2) not all of my leave taken resulting from the injury I sustained on June 6, 2007 was restored. The agency used 64 hours of annual leave, related to this injury and that has not been restored.

If I had been granted a Hearing, as I anticipated, I would have been able to point this out. I am submitting this for the record within the timeframe for an appeal and respectfully ask that you review this aspect of the case with a view toward correcting this error in the record. Further, if this corrected information is sufficient basis for you to reverse your decision, I respectfully ask you to do so and would appreciate you taking whatever steps are necessary to make this right and advise me, or my counsel of record accordingly.

Thank you for your cooperation.

Sincerely,

Rixene Hicks


Cc: Stuart Bernsen
Scott Sadler

Sent via fax  (703) 756 7112        Date:  December 10, 2007