# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RIXENE HICKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 07-1959 (HHK) |
| | ) |
| LORI BLEDSOE, | ) |
| | ) |
| Defendant | ) |

## MOTION FOR SUMMARY JUDGMENT
## OR IN THE ALTERNATIVE TO DISMISS PLAINTIFF'S COMPLAINT

Defendant[1] respectfully moves for summary judgment pursuant to Fed. R. Civ. P. 56 or in the alternative to dismiss the claims against it for lack of subject matter jurisdiction and failure to state a claim under Rule 12(b)(1) and (6).  In short, Plaintiff's claim for assault must be dismissed under the Federal Tort Claims Act (FTCA) because she has not exhausted her administrative remedies and, moreover, Congress has not waived the federal government's sovereign immunity for this particular tort.  This motion is based on the memorandum in support,

---

[1] The original Defendant, Lori Bledsoe, was replaced as defendant by the United States by virtue of the certification that Ms. Bledsoe was acting within the scope of her employment at the time of the events alleged in the complaint.  See 28 U.S.C. § 2679(d)(1) and Ex. 1 hereto (certification).  On March 11, 2008, Defendant filed a motion to amend the case caption to reflect the substitution of the United States for Ms. Bledsoe as the proper defendant.  See PACER DKT. # 4.

filed simultaneously herewith, and the entire record in this case.

Respectfully submitted,

/s/
_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____/s/_____

HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530
(202) 305-1334

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RIXENE WINETTE HICKS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 07CV1959 (HHK)** |
| ) | |
| **LORI BLEDSOE,** ) | |
| ) | |
| **Defendant** ) | |

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE

_____Pursuant to Local Rule 7 (h), the defendant hereby submits the following material facts as

to which there is no genuine dispute:

1.   Ms. Hicks began her employment in PBGC's EEO Office as a GS-9, Step 9

Administrative Specialist in May 2006.  See Exhibit 2 & 7(Declaration of Rixene

Hicks), ¶ 3.

2.   During a meeting on May 10, 2007, Ms. Lori Bledsoe, her supervisor, criticized

her performance.  During the May 10, 2007, meeting, Ms. Bledsoe informed Ms.

Hicks that her performance was unacceptable.  See Exhibit 7, ¶ 15.

3.   On June 6, 2007, Ms. Bledsoe held another performance meeting with Ms. Hicks.

The meeting occurred in Ms. Bledsoe's office with the door closed.  The meeting

took place shortly before 5:00 p.m., which was Ms. Hicks' scheduled departure

time.  See Exhibits 2, 3 & 7, ¶ 18.

4.      During the June 6, 2007 meeting, Ms. Bledsoe handed Ms. Hicks a memorandum

dated June 6, 2007 entitled "Our May 10, 2007 Performance Meeting and

Performance Counseling."   The memorandum was critical of her job

performance.  Ms. Hicks was required to sign for receipt of the memorandum.

See Exhibit 4.

5.      On June 7, 2007, Ms. Hicks went to PBGC's Human Resources Department

(HRD) and reported the June 6th incident to Ricardo Silva, an employee relations

specialist in HRD.  Ms. Hicks also provided HRD with a document summarizing

her complaint.  See Exhibit 2 & 7 (Supplemental Declaration of Rixene Hicks,

Exhibit B) ¶ 2.

6.      As a result of the meeting with Mr. Silva in HRD, PBGC management

immediately moved Ms. Hicks to a workstation in the Facilities and Services

Department (FASD) on the fourth floor -- six floors away from the EEO Office.[2]

For the remainder of June 7, 2007, Ms. Hicks worked at a fourth floor workstation

and communicated via e-mail with the EEO Office.  Ms. Hicks had no further

contact with Ms. Bledsoe.  Id.

7.      On June 8, 2007, Ms. Bledsoe was instructed to work from home to ensure that

she would have no contact with Ms. Hicks while the matter was being

investigated.  Ms. Bledsoe worked from home for the next several days.

See Exhibit 7(Supplemental Declaration), ¶ 2.

8.      On June 11, 2007, Ms. Hicks reported to FASD.  Id.  On June 12 - 19 when

_____

[2] The EEO Office is located on the tenth floor.

2

Plaintiff reported to the EEO Office, Ms. Bledsoe was not present in the office because she was working from home on flexi-place.  See Exhibits 2 & 7(Supplemental Declaration), ¶ 2.  Plaintiff was out of the office from June 20, 2007 until July 16, 2007.  See Id.  On July 17, 2007, plaintiff reported to HRD on the 2nd floor, until she was detailed to another office on July 23, 2007.  Id.

8.    Ms. Hicks began her detail to the Office of Chief Counsel on July 23, 2007.  See Exhibit 5.  Ms. Hicks was offered a permanent position in the Office of Chief Counsel and she has accepted that position.  She has remained as a permanent employee in the Office of Chief Counsel through the present.  More importantly, at no time has she been required to return to her former position in the EEO Office.  There is no evidence to suggest that Ms. Hicks has had additional encounters with Ms. Bledsoe since the June 6, 2007 meeting.

See Exhibits 2, 6 & 7.

Respectfully submitted,

/s/

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/

_____

HEATHER D. GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W.
Washington, D.C.  20530
(202) 305-1334

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **RIXENE HICKS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 07-1959 (HHK)** |
| | ) |
| **LORI BLEDSOE,** | ) |
| | ) |
| **Defendant** | ) |

---

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ITS MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION**
**FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant, named in the complaint as Lori Bledsoe but properly identified as the United States of America, moves for summary judgment under Rule 56 and to dismiss the claims against it for lack of jurisdiction and failure to state a claim under Rule 12(b)(1) and (6).  Plaintiff brings tort claims for assault, and alleging that Lori Bledsoe made her feel intimidated and threatened at the conclusion of a meeting on June 6, 2007 at the Pension Benefit Guaranty Corporation (PBGC) where plaintiff and Ms. Bledsoe are employed.  First, these claims must be dismissed under the Federal Tort Claims Act (FTCA) because Plaintiff has not exhausted her administrative remedies and, moreover, Congress has not waived the federal government's sovereign immunity for this tort.  Second, because Plaintiff was undeniably within the scope of her employment at the time of the alleged incident, her exclusive remedy for her injuries is under the Federal Employees Compensation Act, 5 U.S.C. §§ 8101 *et seq*. ("FECA").  This action is therefore also barred by FECA exclusivity.

## II.      BACKGROUND

Plaintiff Rixene Hicks brings this complaint for injunctive relief and damages against the federal defendant, Lori Bledsoe, EEO Manager for the Pension Benefit Guaranty Corporation (PBGC), a wholly owned federal government corporation.  Plaintiff alleges that on or about June 6, 2007, Defendant threatened and held Plaintiff hostage in Ms. Bledsoe's office.  See Complaint and Motion to Amend, PACER DKT. # 6, Exhibits 2 & 7.  Plaintiff's initial complaint requested relief in the form of "maximum protection allowed by the law, keeping Lori Bledsoe away from [her], maximum distance."  See Complaint.

On or about October 11, 2007, the Plaintiff filed a complaint in the Superior Court of the District of Columbia.  Id.  On or about October 31, 2007, Defendant removed the Complaint from that Court to the United States District Court and moved to substitute the United States for the Defendant. See PACER DKT. # 1 & 4.  More recently, on March 28, 2008, Ms. Hicks filed a motion to amend her original complaint for restraining order to include damages.[3]  See PACER DKT. # 6.  The United States respectfully submits that it is entitled to summary judgment, and the Complaint should be dismissed with prejudice in its entirety.

## II.    FACTS

A.      Ms. Hicks' Experience in the EEO Office

Ms. Hicks  began her employment in PBGC's EEO Office as a GS-9, Step 9 Administrative Specialist in May 2006.  Exhibit 2 & 7(Declaration of Rixene Hicks), ¶ 3. During a meeting on May 10, 2007, Ms. Lori Bledsoe, her supervisor, criticized her performance.

---

[3] As will be discussed in greater detail below, under the Federal Tort Claims Act at 28 U.S.C.A. 2675, Ms. Hicks was required to file an administrative claim with PBGC for the damages she has claimed to have suffered.  She has not filed any such claim with PBGC.

Exhibit 7, ¶ 15.  During the May 10, 2007, meeting, Ms. Hicks alleges that Ms. Bledsoe informed her that her performance was unacceptable and she wanted to begin weekly meetings with Ms. Hicks to discuss her performance.  Id.  Ms. Bledsoe held one such meeting to discuss Ms. Hicks' performance on May 25, 2007.  During the May 25, 2007, meeting, Ms. Hicks alleges that Ms. Bledsoe spoke to her about Ms. Bledsoe's ongoing concerns about Ms. Hicks' performance.

On June 6, 2007, Ms. Bledsoe held another performance meeting with Ms. Hicks.  See Complaint and PACER DKT. # 6, Exhibits 2 & 7.  The meeting occurred in Ms. Bledsoe's office with the door closed.  The meeting took place shortly before 5:00 p.m., which was Ms. Hicks' scheduled departure time.  Complaint and PACER DKT. # 6; and Exhibit 7.  Next, Ms. Hicks alleges that Ms. Bledsoe handed her a memorandum dated June 6, 2007 entitled "Our May 10, 2007 Performance Meeting and Performance Counseling."  See Complaint and Exhibit 4.  The memorandum was critical of her job performance.  See Exhibit 4.  Ms. Hicks was required to sign for receipt of the memorandum.  Id.  Ms. Hicks responded to Ms. Bledsoe that because it was her scheduled time to leave work, she did not have time to read the May 10th memorandum and would not sign anything without first reading it.  See Complaint and PACER DKT. # 6.  Ms. Hicks told Ms. Bledsoe that she wanted a witness at the meeting and rose to leave.  Id. According to Ms. Hicks, Ms. Bledsoe "hollered" at Ms. Hicks to sit down and refused Ms. Hicks' request for a witness.  Exhibits 2 & 7.  Ms. Hicks then claims that she informed Ms. Bledsoe that she was leaving the room, got up from her chair, and walked to the door.  Ms. Hicks alleges that Ms. Bledsoe blocked her exit from the office.  Id.  Ms. Hicks claims she placed her hand on the door knob to push it down and open it and Ms. Bledsoe placed her hand on top of hers.  Exhibit 7.  Ms. Hicks alleges that a heated discussion began, and that Ms. Bledsoe again

yelled at Ms. Hicks to sit down.  Id.  According to Ms. Hicks, Ms. Bledsoe then told Ms. Hicks

that she would note on the document that Ms. Hicks wanted an opportunity to read it.  Id.  Ms.

Bledsoe then left Ms. Hicks to make a copy of the document.  Id.  Ms. Bledsoe returned to her

office and gave the document to Ms. Hicks, and concluded the meeting.  Following the meeting,

Ms. Hicks went home because she had completed her eight-hour workday.  Id.

      B.    Ms. Hicks Reports the Meeting and PBGC Takes Steps to Allay Ms. Hicks'
              Concerns

      The next day June 7, 2007, Ms. Hicks went to PBGC's Human Resources Department

(HRD) and reported the June 6th incident to Rick Silva, an employee relations specialist in HRD.

Exhibits 2 & 7 (Supplemental Declaration of Rixene Hicks, Exhibit B) ¶ 2.  As a result of that

meeting, PBGC management immediately moved Ms. Hicks to a workstation in the Facilities and

Services Department (FASD) on the fourth floor -- six floors away from the EEO Office.[4]  For

the remainder of June 7, 2007, Ms. Hicks worked at a fourth floor workstation and

communicated via e-mail with the EEO Office.  Id.

On June 8, 2007, Ms. Bledsoe was instructed to work from home to ensure that she would

have no contact with Ms. Hicks while the matter was being investigated.  Ms. Bledsoe worked

from home for the next several days.  Exhibit 7 (Supplemental Declaration), ¶ 2.  At the same

time, Ms. Hicks worked for the next several days under Ms. Holder's supervision in the Facilities

and Services Department (FASD) on the 4th floor.  Id.  Consequently, Ms. Bledsoe worked from

home and was separated from Ms. Hicks immediately after Ms. Hicks brought her allegations to

the attention of PBGC management.  Ms. Hicks has made no allegations that there were any

_____

[4] The EEO Office is located on the tenth floor.

problems while Ms. Blesdoe was working from home.  In sum, as soon as Ms. Hicks brought her concerns about Ms. Bledsoe to the attention of PBGC management, PBGC immediately took steps to ensure that Ms. Hicks and Ms. Bledsoe would not interact.  Indeed, Ms. Hicks and Ms. Bledsoe have not worked together since June 6, 2007.

Until approximately June 19, 2007, Ms. Hicks remained in the EEO Office under Ms. Holder's supervision.  On June 20, 2007, Ms. Hicks filed a first step grievance.  Also on June 20, 2007, Ms. Hicks began a period of sick leave that lasted through July 16, 2007.  Id.  The period of sick leave began approximately 2 weeks after the June 6, 2007 incident.

On July 9, 2008, Stuart Bernsen, Ms. Hicks' representative, requested in an e-mail to HRD's Ruben Moreno that Ms. Hicks be detailed or reassigned from the EEO Office.  To allay Ms. Hicks' concerns about working in close proximity to Ms. Bledsoe, Mr. Moreno, informed Mr. Bernsen that Ms. Hicks could be relocated to FASD while the agency explored the possibility of a "detail or reassignment" for Ms. Hicks.   When Ms. Hicks decided to return to the office on July 23, 2007, she was offered a 90-day detail in the Office of Chief Counsel.  Ms. Hicks voluntarily accepted the detail to the Office of Chief Counsel, and she continues to work there.  Exhibit 5 & 6.  Ms. Hicks has made no complaints to PBGC concerning the detail.

 Ms. Hicks began her detail to the Office of Chief Counsel on July 23, 2007.  Ms. Hicks was offered a permanent position in the Office of Chief Counsel and she has accepted that position.  She has remained as a permanent employee in the Office of Chief Counsel through the present.  Exhibit 5, 6 and 7.  More importantly, at no time has she been required to return to her former position in the EEO Office.  There is no evidence to suggest that Ms. Hicks has had additional encounters with Ms. Bledsoe since the June 6, 2007 meeting.

III.   **ARGUMENT**

   I.   **STANDARD OF REVIEW**

   A.   **Summary Judgment**

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue of material fact exists, the Court must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  Matsushita, 475 U.S. at 587.  The mere existence of a factual dispute, however, will not defeat summary judgment.  The non-moving party must show that the dispute is genuine and material to the case.  That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  Anderson, 477 U.S. at 247-48; Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  Id. (citing Anderson, 477 U.S. at 249-50.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  Celotex Corp., 477 U.S. at 323 (citations omitted).

   B.   **MOTION TO DISMISS**

A motion under Rule 12(b)(1) or 12(b)(6) "tests the legal sufficiency of the complaint."

6

ACLU Foundation of Southern Calif. v. Barr, 952 F.2d 457, 472 (D.C. Cir. 1991). When

reviewing such motions, the Court must take the allegations in the non-movant's pleading as

true. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Sinclair v. Keindienst, 711 F.2d 291,

293 (D.C. Cir. 1983). However, "a court must accept only well-pleaded allegations of fact, it

need not accept legal conclusions." Taiwo Okusami v. Psychiatric Institute of Washington, Inc.,

959 F.2d 1062, 1069 (D.C. Cir. 1992) (Sentelle, J., concurring in part and dissenting in part)

(quoting 5A Wright & Miller, Federal Practice and Procedure, § 1357 at 315) (internal quotes

omitted). Even for *pro se* plaintiffs, "the district court 'need not accept inferences drawn by

plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the

court accept legal conclusions cast in the form of factual allegations.'" Henthorn v. Department

of Navy, 29 F.3d 682, 684 (D.C. Cir. 1994) (quoting Kowal v. MCI Communications Corp., 16

F.3d 1271, 1276 (D.C. Cir. 1994)).

   A court may consider evidence beyond the pleadings in ruling on a 12(b)(1) motion

challenging jurisdiction, though it is not required to do so. See Herbert v. National Academy of

Science, 974 F.2d 192, 197 (D.C. Cir. 1992). In ruling on a 12(b)(6) motion, a court is limited to

the allegations in the complaint and "other matters of public record including court files, records

and letters of official actions or decisions of government agencies and administrative bodies,

documents referenced and incorporated in the complaint and documents referenced in the

complaint or essential to a plaintiff's claim which are attached to a defendant's motion." See

Arizmendi v. Lawson, 914 F. Supp. 1157, 1160-61 (E.D. Pa. 1996).

   On December 31, 2007, the Attorney General, through Rudolph Contreras, Chief, Civil

Division, Office of the United States Attorney for the District of Columbia, certified that

individually-named federal Defendant, Lori Bledsoe, was acting within the scope of her employment as a federal employee at the time of the incidents out of which Plaintiff's claims in this action arose. <u>See</u> PACER DKT # 5. Barring an appropriate challenge, that certification operates to substitute the United States of America for individually-named federal defendant Small. <u>See</u> 28 U.S.C. § 2679(d)(1).

Here, as discussed further below, Plaintiff's claim is jurisdictionally barred on several independent grounds. First, plaintiff has failed to comply with the mandatory administrative claim requirement of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq*. ("FTCA" or "the Act"), the only waiver of sovereign immunity for plaintiff's common law tort committed by another federal employee acting within the scope of his employment. Second, plaintiff's action runs afoul of 28 U.S.C. § 2680(h), barring money damages claims against the United States sounding in assault. On each of these separate grounds, then, this action against the United States must be dismissed under Federal Rule of Civil Procedure 12(b)(1).

**I.      The United States Must Be Substituted for the Individual Defendant.**

The FTCA expressly provides that any common law tort suit brought against a federal employee must be treated as a suit against the United States once the Attorney General (or his delegate) certifies that the employee acted within the scope of his employment:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court <u>shall</u> be deemed an action against the United States under the provisions of this title and all references thereto, and the United States <u>shall</u> be substituted as the party defendant.

28 U.S.C. § 2679(d)(1) (emphasis added). In this case, the United States filed such a certification

8

for the individual defendant contemporaneously with removal of this civil action. See PACER

DKT. # 1. Therefore, the individual defendant is entitled to immunity under section 2679. See

United States v. Smith, 499 U.S. 160, 162-63 (1991); Brown v. Armstrong, 949 F.2d 1007, 1010

(8th Cir. 1991). In the place of the individual defendant, the United States is substituted as the

exclusive defendant for all common law tort claims and the case against the individual defendant

is dismissed. See also Sami v. United States, 617 F.2d 755, 768 (D.C. Cir. 1979) (federal

employees immune from defamation suit when acting "within the ambit of discretion"); Trifax v.

District of Columbia, 53 F. Supp. 2d 20 (D.D.C. 1999) ("acting within the outer perimeter of the

duties"), aff'd, 314 F.3d 641 (D.C. Cir. 2003).

Automatic dismissal of the case against the individual defendant is fully consistent with

the exclusivity of the tort remedies provided by the Federal Tort Claims Act, 28 U.S.C.

§ 2679(b)(1). The FTCA pre-empts any tort actions directly based on the common law or state

law, including D.C. law, against the United States, its agencies, or employees. See Expeditions

Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution, No. 74-1899, (D.C. Cir., June 28,

1976), reprinted in 566 F.2d 289 App. A-1, at 295-99; Kline v. Republic of El Salvador, 603 F.

Supp. 1313, 1316 (D.D.C. 1985).

## II.    No Waiver of Sovereign Immunity Under the FTCA

It is well settled that "[t]he United States, as sovereign, is immune from suit save as it

consents to be sued, . . . and the terms of its consent to be sued in any court define that court's

jurisdiction to entertain the suit." Hercules Inc. v. United States, 516 US 417, 422-23 (1996)

quoting United States v. Testan, 424 U.S. 392, 399 (1976), quoting United States v. Sherwood,

312 U.S. 584, 586 (1941)). See also United States v. Orleans, 425 U.S. 807 (1976); United

States v. Testan, 424 U.S. at 399  ("except as Congress has consented to a cause of action against the United States, 'there is no jurisdiction . . . to entertain suits against the United States'") (quoting United States v. Sherwood, 312 U.S. at 587-88).

Where the federal government waives its immunity from suit, "limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." Lehman v. Nakshian, 453 U.S. 156, 160-61 (1981). "[A] waiver of [sovereign] immunity . . . must be 'unequivocally expressed.'" Id. See also United States v. Nordic Village, 503 U.S. 30, 33-34 (1992); United States v. King, 395 U.S. 1, 4 (1969). Such waivers are construed "strictly in favor of the sovereign." Library of Congress v. Shaw, 478 U.S. 310, 318 (1986). See also Department of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999); United States v. King, 395 U.S. at 4; United States v. Erika, Inc., 456 U.S. 201, 206 n.6 (1982).

Finally, a party bringing suit against the United States bears the burden to prove that the government has unequivocally waived its immunity. United States v. Sherwood, supra; Interstate Bank Dallas, N.A., v. United States, 769 F.2d 299, 303 (5th Cir. 1985); Cominotto v. United States, 802 F.2d 1127, 1129 (9th Cir. 1986); Cole v. United States, 657 F.2d 107, 109 (7th Cir.), cert. denied, 454 U.S. 1083 (1981).

The FTCA is a limited waiver of sovereign immunity, and the exclusive remedy, for claims for money damages sounding in tort for injuries to person or property as a result of an act or omission by a federal agency or employee acting within the scope of employment. 28 U.S.C. §§ 1346(b), 2671, 2675. See, e.g., United States v. Smith, 499 U.S. 160 (1991) (FTCA is the exclusive mode of recovery for the tort of a government employee, "even when the FTCA itself precludes Government liability" or operates to preclude a remedy altogether); Simpkins v.

10

District of Columbia Gov't, 108 F.3d 366, 371 (D.C. Cir. 1997); see also Mitchell v. Carlson, 896

F.2d 128, 135 (5th Cir. 1990) (it is settled law that "Congress clearly intended the FTCA, with all

of its exclusions and limitations, to provide the sole remedy for persons injured by federal

employees acting within the scope of their employment").  The Act thus permits suits against the

United States subject to those terms and conditions imposed by the statute, which are to be

strictly construed.  Garcia v. United States, 776 F.2d 116, 118 (5th Cir. 1985); United States v.

Sherwood, 312 U.S. 584 (1941).  Plaintiff has failed to fulfill at least one of those mandatory

conditions: exhaustion of her administrative remedies.

     The FTCA requires plaintiff to submit an administrative claim prior to suing in federal

court.  See 28 U.S.C. § 2675(a).  Plaintiff fails to allege facts showing that she has exhausted her

administrative remedies under the FTCA for the harm alleged in her complaint.  Indeed, the

chronology of the events set forth in the Complaint render it nearly impossible for plaintiff to

have fully and completely exhausted her claim.

     Plaintiff has not alleged that she ever filed an administrative tort claim with the U.S.

Department of Labor.  Moreover, even if she had filed one immediately after the alleged assault,

the six months allotted for such a claim to be processed by the agency cannot have yet run.  See

28 U.S.C. § 2675(a).[5]  This requirement is jurisdictional and cannot be waived.  Hohri v. United

---

[5] In pertinent part, the statute provides:

> An action shall not be instituted upon a claim against the United States for money
> damages for injury of loss of property or personal injury . . caused by the negligent
> or wrongful act or omission of any employee of the Government while acting
> within the scope of his office or employment, unless the claimant shall have first
> presented the claim to the appropriate Federal agency and his claim shall have
> been finally denied by the agency in writing and sent by certified or registered
> mail.  The failure of an agency to make final disposition of a claim within six

States, 782 F.2d 227, 245-46 (D.C. Cir. 1986), reh'g denied, 793 F.2d 304 (D.C. Cir. 1987), rev'd on other grounds sub nom., United States v. Hohri, 482 U.S. 64 (1987).  An action cannot be maintained under the FTCA where the complaint is filed before such an administrative claim is finally denied or six months have passed.  See 28 U.S.C. § 2401(b).  Therefore, because plaintiff has not properly exhausted her administrative remedies, this Court lacks jurisdiction to entertain plaintiff's tort claims against the United States.  Id.; McNeil v. U.S. Public Health Serv., 508 U.S. 106 (1993); GAF Corp. v. United States, 818 F.2d 901, 904 & n.86 (D.C. Cir. 1987).

Because plaintiff has not even alleged exhaustion, she has failed to assert facts that would state a claim within the jurisdiction of this Court.  See Altman v. Connally, 456 F.2d 1114, 1116 (2d Cir. 1972) ("Insofar as the complaint seeks recovery from the United States in tort, it was also deficient in that, apart from other considerations, it failed to allege the presentation of a claim to the appropriate Federal agency and a final disposition of the claim by that agency."); Clayton v. Pazcoquin, 529 F. Supp. 245, 247-48 (W.D. Pa. 1981) (dismissing for lack of jurisdiction, inter alia, because the complaint did not allege that an administrative claim was presented to the Federal agency); Campbell v. United States, 496 F. Supp. 36, 38 (E.D. Tenn. 1980) ("The complaint herein is deficient, in that it fails to aver that the required administrative procedures were timely commenced and that there has been a final disposition of the administrative claim by the appropriate agency or agencies.").  Nor can plaintiff establish jurisdiction by filing an administrative complaint now because an action cannot be maintained

---

months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a).

under the Federal Tort Claims Act where the complaint is filed before such an administrative

claim is finally denied or six months have passed.  McNeil, 508 U.S. at 111-13.  Accordingly,

this case must be dismissed.  Fed. R. Civ. P. 12(b)(1).

**III.    Plaintiff's Intentional Tort Claim Must be Dismissed Because Assault Is Not Covered By the FTCA.**

There is a second, independent reason why this case should be dismissed.  The FTCA

also specifies certain torts for which the statute expressly does <u>not</u> waive the government's

sovereign immunity.  See 28 U.S.C. § 2680.  Among those exempted claims are those "arising

out of assault, battery, . . . *Provided*, that, with regard to acts or omissions of investigative or law

enforcement officers of the United States Government, the provisions of this chapter and section

1346(b) shall apply to any claim arising . . .out of assault, [or] battery . . [.]" 28 U.S.C. § 2680(h).

Because neither Ms. Hicks nor Ms. Bledsoe are or were investigative or law enforcement

officers, the FTCA excludes all claims "arising out of assault [or] battery."  Because  the conduct

alleged to be tortious falls within one of the exceptions in 2680(h) to the FTCA's limited waiver

of sovereign immunity, the Court also lacks subject matter jurisdiction over the action.  Dalehite

v. United States, 346 U.S. 15, 24 (1953); Jablonski v. United States, 712 F.2d 391, 395 (9th Cir.

1983); Boda v. United States, 698 F.2d 1174, 1176 (11th Cir. 1983); Gibson v. United States,

457 F.2d 1391, 1392 n.1 (3rd Cir. 1972); Konecny v. United States, 388 F.2d 59, 62 (8th Cir.

1967).

The "arising out of" language is broadly construed; the pertinent question is whether the

plaintiff's claim is "within the words and reason of the exception." Kosak v. United States, 465

U.S. 848, 853 n.9 (1984).  See also United States v. Shearer, 473 U.S. 52 (1985).  In this case,

13

the essence of plaintiff's claim is plainly one for assault by a co-worker.  Therefore, it is clear

that plaintiff's complaint should be dismissed for a second, independent lack of jurisdiction.

Fed. R. Civ. P. 12(b)(1).

## IV.    FECA Bars This Action

The Federal Employees Compensation Act, 5 U.S.C. §§ 8101-8193 ("FECA"), provides a

comprehensive remedy to a federal employee for injuries "sustained while in the performance of

his duty." 5 U.S.C. § 8102.   The remedies provided under FECA are the <u>exclusive</u> remedies for

injuries falling within its coverage.  The statutory language is explicit:

> The liability of the United States [under FECA] . . . with respect to the injury or
> death of an employee <u>is exclusive and instead of all other liability of the United</u>
> <u>States</u> . . . to the employee . . . because of the injury or death in a direct judicial
> proceeding, in a civil action, . . . or under a Federal tort liability statute. (Emphasis
> added).

5 U.S.C. § 8116(c).  The Supreme Court has consistently recognized that FECA's exclusive-

liability provision was designed to protect the Government from suits under other statutes, such

as the Federal Tort Claims Act (FTCA), which would otherwise waive the Government's

sovereign immunity for claims brought by non-employees.  See <u>United States v. Lorenzetti</u>, 467

U.S. 167, 169 (1984) ("Because the United States' liability for work-related injuries under FECA

is exclusive, <u>see</u> § 8116(c), respondent cannot recover from the United States for losses such as

pain and suffering that are not compensated under FECA."); <u>Lockheed Aircraft Corp. v. United</u>

<u>States</u>, 460 U.S. 190, 193-94 (1983).

In enacting this FECA provision, Congress adopted the principal compromise commonly

found in workers' compensation legislation, that employees are guaranteed the right to receive

immediate, fixed benefits, regardless of fault and without need for litigation, but in return they

lose the right to sue the government.  See Lockheed, 460 U.S. at 193-94; Tredway v. District of Columbia, 403 A.2d 732, 734 (D.C. App. 1979) (exclusivity provision intended "to limit the government's liability to a low enough level so that *all* injured employees can be paid some reasonable level of compensation for a wide range of job-related injuries, regardless of fault.").

The only relevant consideration here is whether FECA covers Plaintiff's injuries and for that the question is whether she was acting within the scope of her employment at the time of her injuries.  It is the actions of the *injured* party that are scrutinized, not the actions of the alleged tortfeasor.

> More importantly, the question of whether Ms. Robinson [alleged assailant] was acting within the scope of her employment is pertinent only to the question of whether United States is properly substituted for Ms. Robinson as defendant.  The relevant inquiry for the purpose of determining whether Ms. Caesar's claims fall within the exclusive purview of FECA, thus depriving this Court of jurisdiction, is whether *Ms. Caesar* was acting within the scope of employment at the time she sustained her injuries.

Caesar, 258 F. Supp. 2d at 5 (emphasis in original, citations omitted); see also Williams v. Morgan, 723 F. Supp. 1532, 1535 (D.D.C. 1989) (distinguishing between analysis of victim's actions under FECA and alleged assailant under FTCA).  The same standards apply for this determination as for the FTCA scope determination (discussed below), i.e. the governing law is the D.C. law on scope of employment in the context of vicarious liability under *respondeat superior*.  See, e.g., Caesar, 258 F. Supp. 2d at 5; see also Hechinger, 761 A.2d at 24 (defining scope of employment standard); Weinberg, 518 A.2d at 988 (same).

Plaintiff is a federal employee who alleges that she sustained injuries in the course of her employment.  See Complaint, generally.  FECA, therefore, provides for her exclusive remedy.

## Conclusion

The certification filed by the United States results in the substitution of the United States as party Defendant for the individual Defendant.  The action must be dismissed, therefore, against the individual Defendant Lori Bledsoe.  Moreover, the entire case must be dismissed for failure to exhaust administrative remedies and because the tort alleged is not within the limited waiver of sovereign immunity in the FTCA and is, therefore, outside the Court's jurisdiction and barred as a matter of law.  Plaintiff's exclusive remedy for the injury she alleges is the FECA.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
Judiciary Center Building
555 4th Street, NW - Civil Division
Rm. 4-4808
Washington, D.C.  20530
(202) 305-1334

16

Exhibit 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RIXENE W. HICKS,** | ) | |
| **12600 Gable Lane,** | ) | |
| **Fort Washington, MD. 20744** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **C.A. No. _____** |
| | ) | |
| **LORI J. BLEDSOE,** | ) | **(D.C. Super. Civ. Act. No. 6853 - 07)** |
| **1200 K. St. NW** | ) | |
| **Suite 1080,** | ) | |
| **Washington, DC 20065** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## CERTIFICATION

I, Rudolph Contreras, Chief of the Civil Division, United States Attorney's Office for the

District of Columbia, pursuant to the provisions of 28 U.S.C. § 2679, and by virtue of the

authority delegated to the United States Attorney by 28 C.F.R. § 15.3 and first redelegated to me

on March 20, 2006, hereby certify that I have read the Complaint in this action.  On the basis of

the information now available with respect to the incidents alleged therein, I find that the

individually-sued defendant, Lori J. Bledsoe, was acting within the scope of her authority as an

employee of the United States at the time of such alleged incidents.

Dated: __10/31/07__

_____
RUDOLPH CONTRERAS,
D.C. BAR #434122
Assistant United States Attorney
Chief, Civil Division

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

| | |
|---|---|
| RIXENE WINETTE HICKS,<br>        Appellant, | DOCKET NUMBER<br>DC-0752-07-0807-I-1 |
| v. | |
| PENSION BENEFIT GUARANTY<br>   CORPORATION,<br>        Agency. | DATE: November 7, 2007 |

Stuart E. Bernsen, Esquire, Rockville, Maryland, for the appellant.

Scott Sadler, Washington, D.C., for the agency.

**BEFORE**
Sherry A. Zamora
Administrative Judge

**INITIAL DECISION**

On August 2, 2007, the appellant filed an appeal alleging that she had been subjected to a constructive suspension for more than 14 days. Appeal File (AF), Tab 1. For the following reasons, the appeal is DISMISSED for lack of Board jurisdiction.

BACKGROUND

Effective May, 2006, the appellant was appointed to the position of Administrative Specialist, GS-9, in the Equal Employment Opportunity office of the Pension Benefit Guaranty Corporation (PBGC). On August 2, 2007, the appellant filed an appeal alleging that, effective July 4, 2007, she had been constructively suspended from employment. AF, Tab 1. The appellant argued

Exhibit 2

that she was subjected to enforced leave in that she was involuntarily indefinitely suspended from Federal employment. *Id.* As it appeared that the Board may lack jurisdiction over the appellant's appeal, the appellant was informed of the applicable burden of proof and was afforded the opportunity to show cause why the appeal should not be dismissed. AF, Tab 5. The appellant filed a response. AF, Tab 7. The agency submitted its file and moved to dismiss the appeal for lack of jurisdiction. AF, Tabs 8[1] and 9. All submissions from both parties have been fully considered herein.

### ANALYSIS AND FINDINGS

The Board's appellate jurisdiction is limited to those matters specifically conferred on it by statute or regulation. 5 U.S.C. § 7701(a). *See Saunders v. Merit Systems Protection Board*, 757 F.2d 1288, 1290 (Fed. Cir. 1985). The appellant bears the burden of proof, by preponderant evidence, to establish that the alleged action is within the Board's jurisdiction. 5 C.F.R. § 1201.56(a)(2)(i). *See Bravman v. Department of the Navy*, 26 M.S.P.R. 169, 171 (1985).

It is undisputed that the appellant was absent from duty beginning June 20, 2007, through July 16, 2007. AF, Tab 7, page 10; Ag. File, Tab 1, Page 4. As the parties were advised in the show cause order, AF, Tab 5, an employee's voluntary absence from work is unappealable. *See Sherrod v. Department of the Navy*, 90 M.S.P.R. 327 (2001). However, an employee's absence for more than 14 days that results in a loss of pay may be a constructive suspension appealable to the Board under 5 U.S.C. §§ 7512(2) and 7513(d). An appellant who asserts a constructive suspension claim must establish by preponderant evidence that her absence was involuntary. *See* 5 C.F.R. § 1201.56(a)(2). *See also Tedesco v. Department of the Air Force*, 90 M.S.P.R. 367, 371 (2001); *Baker v. U.S. Postal Service*, 71 M.S.P.R. 680, 692 (1996).

---

[1] The agency file is found at this tab in the appeal file.

Exhibit 2

The appellant states that, on June 6, 2007, she had a meeting with her supervisor, Lori Bledsoe, in the EEO office,[2] during which the appellant's performance was discussed.[3] AF, Tab 5. The appellant contends that, during this meeting, she was physically threatened and assaulted. *Id.* Specifically, the appellant alleges as follows: Ms. Bledsoe informed her that she needed to sign a memorandum regarding a performance issue but the appellant refused to sign it without having adequate time to read it and without having a witness present. *Id.* at page 7. The appellant asserts that she stood to leave but her supervisor "hollered" at her to sit down. *Id.* The appellant stated that she proceeded to approach the door and had her hand on the door knob in order to open the door but Ms. Bledsoe put her hand over the appellant's hand and prevented the appellant from opening the door. *Id.* at pages 7-8. The appellant contends that she "pleaded" with her supervisor to allow her to leave but that Ms. Bledsoe screamed at her and repeatedly demanded that she sit down. *Id.* at page 8. The appellant asserted that her supervisor "kept pointing and yelling saying [she needed] to shut up and [sit] down." She stated that Ms. Bledsoe was "in a rage and out of control" and that her "veins were bulging and her eyes were red and popping." *Id.* The appellant asserted that Ms. Bledsoe was "foaming and saliva was flying in [her] face." *Id.* The appellant indicated that she sat down,

---

[2] The agency asserts without dispute that the EEO office is located on the 10th floor. AF, Tab 9, Page 4.

[3] I note that, in her response to the show cause order, the appellant included a timeline of the alleged events. AF, Tab 7, page 10. In that timeline, the appellant indicates that June 5, 2007, was the date of the alleged "assault." However, in her narrative response in the same pleading, the appellant indicated that the event occurred on June 5, 2007. *Id.* at page 6. This was clearly a typographical error as the appellant also referred to another communication with agency officials on the day prior which she identified as June 5, 2007. *Id.* The remainder of the appellant's submissions are consistent that the alleged incident occurred on June 6, 2007. For instance, in her complaint to the agency made contemporaneously with the alleged incident, the appellant indicates that the incident occurred on June 6, 2007. Ag. File, Tab 4K.

Exhibit 2

Ms. Bledsoe seemed to calm down and, after making copies of relevant documentation, she allowed the appellant left her office. *Id.* The appellant indicated that the meeting lasted approximately eight minutes. *Id.*

The appellant indicated that Ms. Bledsoe's actions constituted a verbal and physical attack which left her very fearful. *Id.* at page 9. She stated that she could not sleep that night and did not want to return to work. *Id.* However, it is undisputed that the appellant did return to work the next day, Thursday, June 7, 2007, and reported the incident to Ricardo Silva in the agency's Human Relations Division (HRD). *Id.* Subsequently, Ruben Moreno, Director, HRD, arranged for the appellant to work in a cubicle on the 4th floor of the agency, in the agency's Facilities and Services Department (FASD), for the remainder of that day. *Id.* at page 10. The appellant further states that she reported to work on Friday, June 8, 2007, where she worked both in the EEO office and in FASD. *Id.* The appellant stated that Ms. Bledsoe was not present on that date when she completed the payroll for the EEO office. *Id.* The appellant further indicated that she returned to work on Monday, June 11, 2007, and worked in FASD, and, on June 12, 2007, she reported to the EEO office as directed. *Id.* She indicated that Mr. Silva had escorted her to the EEO and assured her safety. *Id.* The appellant stated that she had begun experiencing pain after the incident with Ms. Bledsoe and that this pain was increasing. *Id.* She indicated that she saw a physician on June 13, 2007, and on June 15, 2007. *Id.* However, on the other dates, June 12, 14, 18, and 19, she reported to the EEO office. *Id.* at pages 10-11. The appellant indicated that Ms. Bledsoe was absent at all times when she reported to work in the EEO office. *Id.* The appellant made no allegations that she was required to work with or for Ms. Bledsoe subsequent to the incident nor did she allege any intolerable working conditions in the EEO office when working there subsequent to the alleged incident. Nonetheless, on June 20, 2007, the appellant again visited her physician. *Id.* at page 11. The appellant asserts that she was unable to return to work from that date through July 16, 2007. *Id.* On July 17, 2007, she

Exhibit 2

reported to HRD where she was provided a cubicle until she was detailed to another office beginning on July 23, 2007. *Id.* The appellant stated that she notified agency officials of "intolerable working conditions" in documentation, including a grievance, filed from May through August, 2007. *Id.* at pages 11-12.

The appellant asserted that the "thought of reporting to the EEO Office became increasingly unbearable." *Id.* at page 11. The appellant appears to allege that her absence from June 20, 2007, through July 16, 2007, was the result of intolerable working conditions. AF, Tab 5.

The Board has held that, when an agency makes an employee's working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign or retire, the resignation or retirement may be involuntary. *See Gerges v. Department of the Navy*, 89 M.S.P.R. 669, ¶ 7 (2001), aff'd, 52 F. App'x 513 (Fed. Cir. 2002); *Markon v. Department of State*, 71 M.S.P.R. 574, 577 (1996); *Heining v. General Services Administration*, 68 M.S.P.R. 513, 520 (1995). In *Peoples v. Department of the Navy*, 83 M.S.P.R. 216, 219-20 (1999), it applied the same standard in determining whether an agency's actions had caused an employee's absence to constitute a constructive suspension. As the Board notes in *Gerges*, "the involuntariness standard stated in *Peoples* and [subsequent cases] is a high one, and ... requires the courts and the Board to focus on whether the agency 'render[ed] the workplace so pervasively unpleasant and difficult' that the employee was 'deprived .... of any other choice but to quit." *See Gerges*, 89 M.S.P.R. at ¶ 9, *citing Heining*, 68 M.S.P.R. at 522. Thus, the appellant must establish that her working conditions essentially left her devoid of any reasonable choice other than to remain away from the workplace.

In this case, it is undisputed that the appellant reported to the agency for work the day after the incident. Although she apparently took leave for medical appointments subsequent to that time, the appellant asserts that she was unable to return to duty beginning on June 20, 2007. AF, Tab 5. Thus, the appellant was apparently able to work for approximately 14 days after the alleged incident.

Exhibit 2

Further, the appellant makes no allegations that she was subsequently directed to work with or for Ms. Bledsoe. Rather, the agency asserts that, upon being advised of the alleged incident on the day after it occurred, it immediately took steps to allay the appellant's concerns about working in close proximity to Ms. Bledsoe. AF, Tabs 8 and 9. The agency noted that agency officials immediately moved the appellant to a work station which was located six floors away from Ms. Bledsoe in FASD, and that it instructed the appellant to perform duties in the EEO office only when Ms. Bledsoe was not at the agency's premises. *Id.* The representations from both parties are completely consistent on these facts. The parties are further consistent regarding assertions that, upon her return to work, the agency provided the appellant with a detail to another office. AF, Tab 5, Page 11; AF, Tab 9, Page 6. The agency asserts without dispute that the appellant's detail has continued until this time. Ag. File, Tab 1, Page 5.

In her written complaint to the agency, which the appellant indicates was written on June 6, 2007, the appellant requested that she "be removed from the EEO office immediately or put on administrative leave..." Ag. File, Tab 4K, Page 1. It appears that the agency essentially met the appellant's demands. Although it is undisputed that the agency directed the appellant to perform some duties in the EEO office subsequent to the alleged incident, it is further undisputed that Ms. Bledsoe was not present. The appellant makes no allegations of intolerable working conditions while working in the EEO office subsequent to the incident when Ms. Bledsoe was not present at the workplace. There are no allegations that the agency ever required the appellant to work with Ms. Bledsoe subsequent to the incident and, in fact, it is undisputed that the agency provided the appellant with working locations as well as a position outside of the EEO office.

It is well established that, where an employee voluntarily initiates their absence, it cannot be deemed a constructive suspension. *See Slocum v. U.S. Postal Service*, -- M.S.P.R. --, ¶ 10 (MSPB Docket No. AT-0752-07-0157-I-1)

Exhibit 2

(October 26, 2007); *Mills v. U.S. Postal Service,* 106 M.S.P.R. 441, ¶ 6 (2007); *Alston v. Social Security Administration,* 95 M.S.P.R. 252, ¶ 11 (2003), *aff'd,* 134 F. App'x 440 (Fed.Cir.2005). In this case, there is nothing to indicate that the agency initiated the appellant's absence. There is insufficient evidence to establish that the appellant's working conditions were rendered so intolerable that a reasonable person would determine that she had no choice but to absent herself from the workplace. The appellant demonstrated her ability to work subsequent to the alleged incident as she continued working for approximately two weeks prior to her extended leave. Further, the agency worked diligently to address the appellant's concerns about working with Ms. Bledsoe and provided her with multiple accommodations to avoid the appellant returning to work for or with Ms. Bledsoe subsequent to the alleged incident. These accommodations have continued despite the findings of the agency's investigation that no harassment from Ms. Bledsoe toward the appellant could be substantiated. Ag. File, Tab 4A. Thus, in sum, the appellant clearly had the option of continuing to return to work subsequent to the incident with the accommodations provided by the agency.[4]

The appellant requested a hearing in this matter. AF, Tab 1. In the case of an alleged constructive suspension, the appellant is entitled to a hearing on the issue of Board jurisdiction only if she makes a non-frivolous allegation that, if proven, could establish that she was constructively suspended. *See Mills,* 106 M.S.P.R. at ¶ 6; *Burgess v. Merit Systems Protection Board,* 758 F.2d 641, 643 (Fed.Cir.1985); *Hamiel v. U.S. Postal Service,* 104 M.S.P.R. 497, ¶ 5 (2007).

---

[4] I note that the appellant provided copies of medical treatment slips showing that she did receive medical attention subsequent to the incident and during her absence. AF, Tab 5. There is little medical information in these treatment slips and there is no indication that the treatment was the result of the alleged incident. Moreover, it is undisputed that the appellant was provided sick leave for these absences. In fact, the agency asserted that it restored some of the appellant's sick leave. Regardless, the fact that an appellant utilizes sick leave for a period of time is alone insufficient to establish that a constructive suspension resulted.

Exhibit 2

I find that the appellant failed to meet this threshold requirement and, accordingly, that she is not entitled to the hearing she requested.

Finally, I note that the appellant raised several affirmative defenses including harmful procedural error, prohibited personnel practices, violations of law, discrimination, and retaliation for protected disclosures. AF, Tab 1. However, it is well established that the Board has no jurisdiction over affirmative defenses absent an otherwise appealable matter. *See, e.g., Hardy v. U.S. Postal Service*, 72 M.S.P.R. 71, 74 (1996), *aff'd*, 114 F.3d 1207 (Fed. Cir. June 12, 1997) (Table); *Swango v. Department of Veterans Affairs*, 59 M.S.P.R. 235, 241 (1993); *Daneshpayeh v. Department of the Air Force*, 57 M.S.P.R. 672, 682 n. 9 (1993), *aff'd*, 17 F.3d 1444 (Fed.Cir.1994) (Table); *Booker v. U.S. Postal Service*, 53 M.S.P.R. 507, *aff'd*, 982 F.2d 517 (Fed. Cir. 1992); *Caballero v. U.S. Postal Service*, 34 M.S.P.R. 263, 266 (1987).

## DECISION

The appeal is DISMISSED.

FOR THE BOARD:

Sherry A. Zamora
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on ____DEC 1 2____, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date

Exhibit 2

on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the

Exhibit 2

determined by the postmark date. The date of filing by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

> The United States Court of Appeals
> for the Federal Circuit
> 717 Madison Place, NW.
> Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

Exhibit 2

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

U.S. Mail

Rixene Winette Hicks
12600 Gable Lane
Fort Washington, MD 20744

Appellant Representative

U.S. Mail

Stuart E. Bernsen
NAGE, Local R3-77
10719 Kings Riding Way #102
Rockville, MD 20852

Agency Representative

U.S. Mail

Scott Sadler, Esquire
Pension Benefit Guaranty Corporation
Office of General Counsel
1200 K Street, N.W.
Washington, DC 20005-4026

_____
November 7, 2007
(Date)

_____
Latisha Clinton
Legal Assistant

Exhibit 2

Complaint –Recorded on June 6, 2007                    RECEIVED

Today June 6, 2007, my supervisor Lori Bledsoe called me by telephone to report to her office for a budget meeting we were to have. As I was about to report to her office, she called to delay the meeting for approximately 40 minutes. She finally met with me at 4:50 PM, only 10 minutes before my tour of duty ends for the day.

She began the meeting criticizing me for some invoices that were delinquent in payment. I reminded her of how many times I had approached her about signing off on the requisition and that her failure to sign the requisition had caused the delinquency and inquired of her what else could I have done? She then retorted, "You could have said more." She then brought forth a memo asking me to sign it saying that it was a follow-up on our "counseling session" of May 10, 2007. *(For the record, there was no counseling session on May 10th or any other time and she knows it. I don't know what you would call what she did but she extracted certain duties from a position description and began stating that I didn't do this or I didn't do that and that was unacceptable. It was really strange listening to her site things in the position description that I had not done yet. I suppose that could be true of everyone who works for the government).* I told her that I was not going to sign anything without reading it and that it was already past my time to leave. I immediately advised her that I wanted a witness since I had filed an informal grievance against her. She said that I could not have one and that I had to sit there and listen to what she was saying. I repeated my request for a witness. When she denied me I said that I was leaving. She said that I was not going anywhere and she got up and blocked me from leaving. I was terrified but tried not to show it and insisted that she let me out. She then said that I was being insubordinate so I backed away from the door since she was refusing to let me out and she seemed out of control. She finally moved from the door so that I could leave. I was very shaken by this incident and a friend assisted me and brought me home. I had never had anything of this nature happen to me before and I was visibly shaken. I felt threatened in light of the atmosphere under which I have been working. Even the Director of the EEO boasted at a staff meeting just a few weeks ago of how she actually had a fist fight on one of her jobs prior to her coming here. Thus I had no one to turn to for help when she held me up in her office and refused to let me out. I was relieved to find David still there and he assisted me home as he had overheard me asking that she please let me out! As it stands now, I feel that I am in danger and need to be removed from the EEO office immediately or put on administrative leave until Rick Silva resolves the grievance that I discussed with him on Tuesday, June 5, 2007, against Lori Bledsoe, my immediate supervisor.

I believe now that the budget discussion was only a pretext for getting me alone so that she could manufacture some evidence and carry out her plan to cover up for all of the agency violations she has committed against me. I also believe that she was intentionally badgering me so that she could claim that I was insubordinate. I further believe that her assault of my personal space against me, and holding me hostage in that manner was unlawful and bordering on criminal behavior. I fear and have reason to believe that she may attempt other such behavior again or even worse given the opportunity.

PBGC-4K-1

Exhibit 3

It is now 11:00 PM and I am unable to sleep because of this incident. I must remember to ask Mr. Silva whether the agency has representatives for employees in my situation, ie, the lawyer named Rhonda Baird who works on the 3rd floor. Also need to know what one does when being accosted as I was today. Do you call the security guards or outside police or just what should I do?

Rixene Hicks

*Rixene Hicks*

PBGC-4K-2

Exhibit 3



**PBGC**
Protecting America's Pensions

**Pension Benefit Guaranty Corporation**
1200 K Street, N.W., Washington, D.C. 20005-4026

June 6, 2007

Memorandum To:    Rixene Hicks
                  Administrative Specialist (EEO)


From:             Lori J. Bledsoe
                  EEO Manager


Subject:          Our May 10, 2007 Performance Meeting and Performance
                  Counseling


This serves as a follow-up to our May 10, 2007, Performance review meeting and discussion and to counsel you in writing about the need to improve your performance.

In advance of our scheduled meeting I advised you to come prepared to discuss your last two 120 day performance cycles, your performance standards, accomplishments, and areas of needed development and training.

I informed you at the beginning of our meeting the purpose of the meeting was to address performance expectations, discuss actual performance, positive as well as any deficiencies, to discuss how to address any deficiencies and to discuss development and training needs.

I covered with you at our meeting that improvements are needed on all five of your performance objectives and discussed specifically that this is the case because several of the objectives are overlapping and because there was a major performance deficiency during the last two 120 days cycles. Those objectives which are approaching an unacceptable level discussed with you are #1, Administrative Work Assignments,   #2 Workload Planning/Program Management and Organizational Priorities , #3 Personal and  Communication Skills, # 4 Customer Service and # 5 Teamwork.  I am clarifying to you, in writing, what specific examples I provided to you regarding deficiencies.

Objective #1, Administrative Work Assignments  You are not producing and completing assignments that are accurate and complete and in compliance with guidelines and demonstrate an effective use of technology, you are not producing the assigned quantity of work in a timely manner.  Assignments are not completed by the established deadlines or with supervisory approval for an extension.  You are not meeting in advance with your management team to get needed clarifications to complete assignments.

                                                        PBGC-4L-1

Exhibit 4

Specific examples provided to you were: 1) You are not maintaining automated records and logs for budget and invoices, needed to prevent further invoice problems 2) You are not obtaining clarification from your supervisor as needed in regard to your budget or other related assignments, example the 2008/2009 budget submission 3) You are spending an inordinate amount of time on some areas, without the expected results , yet not addressing other key assignments and duties, 4) there has been major performance deficiency, in which you did not pay the interpretive service invoices from 2006 and 2007 in a timely fashion and did not keep me apprised of the problem, resulting in a violation of PBGC's contracting and procurement authority and requiring a ratification request submission in the amount of $86, 179.75 due to past unpaid invoices for interpretive services.

You were informed of the seriousness of this particular performance deficiency and the necessity to provide formal counseling in regard to the matter due to the extensive impact your performance had not only this office, but our reputation with our customers within in and outside the Corporation, as well as the major impact it had on additional time and resources spent attempting to correct the deficiency.

Objective #2, Workload Planning/Program Management and Organizational Priorities You are not completing assignments and working with your management team to ensure that programs and systems are operated sufficiently. You are not producing budget documents that are realistic and responsive to the office needs and goals. You are not making prompt decisions based on available information and adjusting decisions when given new information. Specific examples provide to you were: 1) Your work submissions on the 2008/2009 Budget, this assignment was not completed timely or within approved extensions from your management team, the submissions to management were not accurate or realistic, they were not proofread to ensure it was correct prior to submission to the reviewer, 2) Supplies that were requested by the new Director upon her arrival five months ago were never completed or followed through on and on multiple occasions management had to request the status, rather than you providing regular updates, as well as ensuring completion of this and all pending assignment. 3) In general you are not keeping your supervisor informed of major developments in assignments, such as the major budget/ invoice performance deficiency,

Objective #3, Personal and Communication Skills. Your work does not demonstrate accurate and complete understanding of your supervisors or the end users requirements, you are not effectively planning and organizing your tasks and using time effectively, your written communications need substantive changes on a regular basis. Specific examples provided to you were 1) Your lack of communication on the regular status of pending work and specifically problem areas, and 2) Written products are not accurate or proofread before submission such as budget reports and submission, counselor reports, meeting minutes.

PBGC-4L-2

Exhibit 4

Objective #4, Customer Service. You are not responsive and timely when dealing with supervisors and customers and you are not keeping the customer or supervisor aware of the status. Customers, including contractor employees, require prompt responses when problems are encountered and follow up.  Examples provided were: 1) Complaints from an employee regarding responsiveness to her request for interpretive services, 2) Need for continuous follow-up from management on the status of assignments and tasks rather than proactive follow-up and demonstrated independence on your part.

Objective #5, Teamwork.  Working effectively in a diverse environment includes sharing information, knowledge and ideas and communicating with Team members and displaying a willing to address team changes.  Each of the performance objectives and deficiencies shared with you has a critical impact on the last three standard objectives of Communication, Customer Service and Teamwork and the previous performance deficiencies.

 Specifically I provided to you the example of the significant changes being made to the EEO program with the arrival of our new Director and the expectation that as a team member you will demonstrate fully effective teamwork by participating when asked for input and not avoiding communications with your team members and managers about concerns and assignments that impact the overall office, like the budget.

I covered both your past training history and provided some training courses to address your need to improve use of technology, 1) an Excel spreadsheet course and 2) to address your budget performance, an additional course in Budget/Finance.  I also pointed out to the need for a writing course and that the earlier course you took this performance cycle, on the Budget process, you never reported how the course benefited you or how you planned to use the course in your current duties.

I informed you that to address these deficiencies I planned to review your performance over the next 30 days and meet weekly to discuss performance with you.  I also informed that at the end of the 30 days I would meet with you and discuss if significant improvements had been made and if not, you may be placed on a Performance Improvement Plan.

 We have had only two meetings since that time and additional performance problems have been pointed out to you. I gave you the opportunity, since it was evident during our meeting that you did not agree with the review of your performance, to provide me in writing any examples or information regarding your belief that your performance was satisfactory or your suggestions for addressing the deficiencies pointed out.  I sent you a reminder the week following our meeting and I never received a response from you.  At neither of our follow-up meetings on May 15th or 22ncd did you come to the meeting prepared or providing me examples of performance improvements.

PBGC-4L-3

I also had to point out further deficiencies, such as, you continuing to not follow up on your assignments or providing status to management on the supplies and budget, the need to remind you of tasks provided earlier and not included in your weekly reports, such as, a requested plan for the clean-up and organization of the multi purpose room and files and paperwork for the arrival of our new HACU Student. I also had to ask you about the training, although at out May 10th meeting I asked you to look into the training, determine if there was other training more cost effective or better suited to help you and provide me an update at our first follow-up meting. Instead you came back at our second meeting only informing me that you registered for the finance course and you still have not provided an update on the Excel course or other training needs. You even informed me you had not looked into other courses as requested.

In sum, you must show immediate and progressive improvement in your assigned work and duties in order to meet Level 2 standards on your overall performance objectives.

We will continue to meet weekly, but besides those meeting I expect updates on a regular basis and not just at our weekly meetings, so that I can see your progress in completing assigned work. I will allow you an additional 30 days from the date of this letter to show improvements, should improvement not be forthcoming, I may need to place you on a formal Performance Improvement Plan (PIP). Failure to improve performance after being placed on a PIP may lead to removal.

In regard to the major performance deficiency resulting in the non-payment and untimely payment of interpretive service invoices from Fiscal Years 2006 and 2007 and the violation of corporate contracting and procurement authority in regard to the interpretive invoices, as well as, not keeping management apprised of major problems, resulting in a required ratification request in the amount of $86,179.75 . This also serves as a formal counseling regarding the severity and inappropriateness of your handling of this work assignment. You should be aware that the PBGC Disciplinary order suggests that that the penalty for this violation is 14 days suspension to removal. However, I have taken into consideration that these were new duties, and mitigated the penalty. That however does not alleviate your responsibility to have requested clarifications and assistance if needed and to have kept me informed and updated regarding problems, which did not occur. As directed at the May 10th meeting you are required to meet weekly on the budget with the EEO Director and me as well as provide weekly budget and credit card reports that reflect the tracking of all invoices and a current and accurate report of available funds in each budget line category. You are also informed that if any other or additional performance deficiencies of a similar scope arise a more severe disciplinary action will be taken.

PBGC-4L-4

**4** Exhibit 4

In regard to your memo you hand delivered to me on May 30, 2007, dated May 26, 2007 I will respond in writing to your memo and concerns shortly.

Finally, if there is a personal problem which is impacting your performance, feel free to contact the Employee Assistance Program at x3330 or 1-800-765-3277. The Employee Assistance Program is free, confidential and voluntary. The counselor will not disclose what you discuss without your written permission.

Please acknowledge receipt of this memorandum by signature below.

Signature:_____

The employee does not want to sign this. She informed me that I was not giving her the opportunity to read this. I am issuing it and she has the opportunity to read it at her leisure.

Lui G. Bledsoe 6/6/2007

PBGC-4L-5

Standard Form 52
Rev. 7/91
5. Office of Personnel Management
FM Supp. 296-33, Subch. 3

● **REQUEST FOR PERSONNEL ACTION** ●

**PART A – Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39.)*

| 1. Actions Requested | 2. Request Number |
|---|---|
| 90 Day Detail | |

| For Additional Information Call *(Name and Telephone Number)* | 4. Proposed Effective Date |
|---|---|
| Lavett Parker x3039 | |

| 5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* | 6. Action Authorized By *(Typed Name, Title, Signature, and Concurrence Date)* |
|---|---|
| *Betsy T. Matsuoka* 7/17/07 | *Israel Goldowitz* 7/17/07 |
| Betsy Matsuoka, Lead Mgmt & Program Analyst | Israel Goldowitz, Chief Counsel |

**PART B -- For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Hicks, Rixene | | | 07/23/2007 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A Code | 5-B Nature of Action | 6-A Code | 6-B Nature of Action |
| 5-C Code | 5-D Legal Authority | 6-C Code | 6-D Legal Authority |
| 5-E Code | 5-F Legal Authority | 6-E Code | 6-F Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| EEO Administrative Specialist/Counselor | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Office of the Executive Director / *Equal Employment Opportunity* | Insurance Program Office Office of Chief Counsel |

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other | | | 0 - None  2 - Conditional | | ☐ YES  ☐ NO |
| 2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | | | 1 - Permanent  3 - Indefinite | | |

| 27. FEGLI | | 28. Annuitant Indicator | | | 29. Pay Rate Determinant |
|---|---|---|---|---|---|

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General | E - Exempt | | |
| 2 - Excepted Service  4 - SES Career Reserved | N - Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station *(City -- County -- State or Overseas Location)* | |
|---|---|---|
| | | PBGC-4F-1 |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other | | |

**PART C - Reviews and Approvals** *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |
| | | | Signature | | Approval Date |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

CONTINUED ON REVERSE SIDE
52-118

OVER

Editions Prior to 7/91 Are Not Usable After 9/30/91
NSN 7540-01-333-6236

Exhibit 5

Standard Form 50
Rev. 201
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HICKS, RUXENE W | | 04/24/1959 | 07/22/2007 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 919 | 5-B. Nature of Action DETAIL NTE 10-19-07 | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | | | | | | 15. TO: Position Title and Number | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADMINISTRATIVE SPECIALIST | | | | | | ADMINISTRATIVE SPECIALIST | | | | | |
| 3300100   0009675 | | | | | | 3300100   0009675 | | | | | |
| 8. Pay Plan GS | 9. Occ. Code 0301 | 10. Grade/Level 09 | 11. Step/Rate 10 | 12. Total Salary 59052 | 13. Pay Basis PA | 16. Pay Plan GS | 17. Occ. Code 0301 | 18. Grade/Level 09 | 19.Step/Rate | 20. Total Salary/Award | 21. Pay Basis PA |
| 12A. Basic Pay 50470 | 12B. Locality Adj. 9382 | 12C. Adj. Basic Pay 59052 | 12D. Other Pay 0 | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE DIRECTOR DEPUTY DIR/OFF OF POLICY & EXT AFFAIR OFF OF EQUAL EMPLOYMENT OPPORTUNITIES | OFFICE OF THE DIRECTOR DEPUTY DIR/OFF OF POLICY & EXT AFFAIR OFF OF EQUAL EMPLOYMENT OPPORTUNITIES |
| WASHINGTON.DC | WASHINGTON.DC |

| EMPLOYEE DATA | | | | |
|---|---|---|---|---|
| 23. Veterans Preference 1 | 1 - None 2 - 5-Point 3 - 10-Point/Disability 4 - 10-Point/Compensable 5 - 10-Point/Other 6 - 10-Point/Compensable/30% | 24. Tenure 1 | 0 - None 1 - Permanent 2 - Conditional 3 - Indefinite | 25. Agency Use | 26. Veterans Preference for RIF YES  X  NO |
| 27. FEGLI Z1 | BASIC + OPTIONAL(5X) + STANDARD + FAMILY(1X) | 28. Annuitant Indicator 9 | NOT APPLICABLE | | 29. Pay Rate Determinant 0 |
| 30. Retirement Plan K | FERS & FICA | 31. Service Comp. Date (Leave) 09/22/1991 | 32. Work Schedule F | FULL-TIME | 33. Part-Time Hours Per Biweekly Pay Period |

| POSITION DATA | | | | |
|---|---|---|---|---|
| 34. Position Occupied 1 | 1 - Competitive Service 2 - Excepted Service 3 - SES Career 4 - SES Career Reserved | 35. FLSA Category E | E - Exempt N - Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status 8888 |
| 38. Duty Station Code 11-0010-001 | | 39. Duty Station (City - County - State or Overseas Location) WASHINGTON,DISTRICT OF COLUMBIA | | |

| 40. Agency Data FUNC CLS 00 | 41. VET STAT X | 42. EDUC LVL 08 | 43. SUPV STAT 8 | 44. POSITION SENSITIVITY NONSENSITIVE/LOW RI |
|---|---|---|---|---|

45. Remarks

PBGC-4F-2

| 46. Employing Department or Agency BG - PENSION BNFT GTY CORP | 50. Signature/Authentication and Title of Approving Official MICHELE FILIPOVICH DIRECTOR OF HUMAN RESOURCES |
|---|---|
| 47. Agency Code BG00 | 48. Personnel Office ID 4158 | 49. Approval Date 07/23/2007 | |

S-Part 50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Exhibit 5

Standard Form 50-B
. 7/91
. Office of Personnel Management
8 Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HICKS, RIXENE W | | 04/24/59 | 07/22/07 |

| FIRST ACTION | | | SECOND ACTION | | |
|---|---|---|---|---|---|
| . Code | 5-B. Nature Of Action | | 6-A. Code | 6-B. Nature of Action | |
| 002 | CORRECTION | | 919 | DETAIL NTE 10-19-07 | |
| . Code | 5-D. Legal Authority | | 6-C Code | 6-D. Legal Authority | |
| | | | | | |
| . Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ADMINISTRATIVE SPECIALIST | STAFF ASSISTANT |

| | 8. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3300100 | 0009675 | | | | | 3420200 | 0009216 | | | | |
| GS | 0301 | 09 | 10 | $ 59852 | PA | GS | 0301 | 09 | | | PA |

| A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $ 50470 | $ 9382 | $ 59852 | $ 0 | | | | |

| 22. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE DIRECTOR<br>DEPUTY DIR/OFF OF POLICY & EXT AFFAIR<br>OFF OF EQUAL EMPLOYMENT OPPORTUNITIES<br><br>WASHINGTON,DC | OFFICE OF THE DIRECTOR<br>CHIEF OPERATING OFFICER<br>CHIEF INSURANCE PROGRAM OFFICER<br>OFFICE OF CHIEF COUNSEL<br><br>WASHINGTON,DC |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 - None    3 - 10-Point/Disability    5 - 10-Point Other<br>2 - 5-Point    4 - 10-Point Compensable    6 - 10-Point/Compensable/30% | 1 | 0 - None    2 - Conditional<br>1 - Permanent    3 - Indefinite | | YES [ ] NO [X] |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| Z1 | BASIC + OPTIONAL(5X) + STANDARD +<br>FAMILY (1X) | 9 | NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|
| K | FERS & FICA | 09/22/91 | F | FULL-TIME |

## POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 | 1 - Competitive Service    3 - SES General<br>2 - Excepted Service    4 - SES Career Reserved | E | E - Exempt<br>N - Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON,DISTRICT OF COLUMBIA |

| 40. Agency Data | | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|---|
| CLS | 00 | X | 08 | 8 | NONSENSITIVE/LOW RI |

45. Remarks

CORRECTS ITEM NUMBER #15 FROM 3300100 0009675
CORRECTS ITEM NUMBER #22 FROM OFFICE OF THE DIRECTOR, DEPUTY DIR/OFF OF
POLICY & EXT AFFAIR, OFFICE OF EQUAL EMPLOYMENT OPPORTUNITIES

PBGC-4F-3

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| BG - PENSION BNFT GTY CORP | MICHELE PILIPOVICH |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | DIRECTOR OF HUMAN RESOURCES |
| BG00 | 4156 | 09/20/07 | 071629829 |

3 - Utility Copy

Exhibit 5

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | | | 2. Social Security Number | | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|---|---|---|
| HICKS, RIXENE W | | | | | | | 04/24/59 | 10/20/07 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 919 | DETAIL NTE 01-18-08 | | |

**SECOND ACTION**

| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
|---|---|---|---|
| | | | |

| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
|---|---|---|---|
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ADMINISTRATIVE SPECIALIST | STAFF ASSISTANT |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3300100 | 0009675 | | | | | 3420200 | 0009216 | | | | |
| GS | 0301 | 09 | 10 | $ 59852 | PA | GS | 0301 | 09 | | | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $ 50470 | $ 9382 | $ 59852 | $ 0 | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE DIRECTOR | OFFICE OF THE DIRECTOR |
| DEPUTY DIR/OFF OF POLICY & EXT AFFAIR | CHIEF OPERATING OFFICER |
| OFF OF EQUAL EMPLOYMENT OPPORTUNITIES | CHIEF INSURANCE PROGRAM OFFICER |
| | OFFICE OF CHIEF COUNSEL |
| WASHINGTON, DC | WASHINGTON, DC |

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 1 | 1 - None     3 - 10-Point/Disability     5 - 10-Point Other<br>2 - 5-Point     4 - 10-Point Compensable     6 - 10-Point/Compensable/30% | 1 | 0 - None     2 - Conditional<br>1 - Permanent     3 - Indefinite | YES [ ]  NO [X] |

| 27. FEGLI | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| Z1 | BASIC + OPTIONAL (5X) + STANDARD +<br>FAMILY (1X) | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|
| K | FERS & FICA | 09/22/91 | F  FULL-TIME | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1 | 1 - Competitive Service     3 - SES General<br>2 - Excepted Service     4 - SES Career Reserved | E  E - Exempt<br>N - Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS   00 | X | 08 | 8 | NONSENSITIVE/LOW RI |

45. Remarks

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| BG - PENSION BNFT GTY CORP | *April Rudolph* |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | ARRIE ETHERIDGE |
|---|---|---|---|
| BG00 | 4158 | 10/29/07 | DIRECTOR OF HUMAN RESOURCES<br>071797193 |

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Exhibit 5

Exhibit 6

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HICKS, RIXENE W | | 04/24/59 | 01/06/08 |

| FIRST ACTION | SECOND ACTION |
|---|---|
| 5-A. Code **721** · 5-B. Nature Of Action **REASSIGNMENT** | 6-A. Code · 6-B. Nature of Action |
| 5-C. Code **N2M** · 5-D. Legal Authority **REG.335.102** | 6-C Code · 6-D. Legal Authority |
| 5-E. Code · 5-F. Legal Authority | 6-E. Code · 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ADMIN SUPPORT SPECIALIST | ADMIN SUPPORT SPECIALIST |
| 3420200        0009671 | 2040020000        0009671 |

| 8 Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16.Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0301 | 09 | 10 | $ 62546 | PA | GS | 0301 | 09 | 10 | $ 62546 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $ 51738 | $ 10808 | $ 62546 | $          0 | $ 51738 | $ 10808 | $ 62546 | $          0 |

| 14 Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF THE DIRECTOR<br>CHIEF OPERATING OFFICER<br>CHIEF INSURANCE PROGRAM OFFICER<br>OFFICE OF CHIEF COUNSEL<br><br>WASHINGTON, DC | OFFICE OF THE DIRECTOR<br>CHIEF INSURANCE PROGRAM OFFICER<br>OFFICE OF CHIEF COUNSEL<br><br>WASHINGTON, DC |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1-None  3-10-Point/Disability  5-10-Point Other<br>2-5-Point  4-10-Point Compensable  6-10-Point/Compensable/30% | 1 — 0-None  2-Conditional<br>1-Permanent  3-Indefinite | | YES ☐  NO ☒ |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| Z1  BASIC + OPTIONAL(5X) + STANDARD + FAMILY(1X) | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS & FICA | 09/22/91 | F  FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 — 1-Competitive Service  3-SES General<br>2-Excepted Service  4-SES Career Reserved | E — E-Exempt  N-Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data NC | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS    00 | X | 08 | 8 | MODERATE RISK |

45. Remarks

| 46. Employing Department or Agency | 50 Signature/Authentication and Title of Approving Official |
|---|---|
| BG - PENSION BNFT GTY CORP | ARRIE ETHERIDGE<br>DIRECTOR OF HUMAN RESOURCES<br>080353153 |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| BG00 | 4158 | 01/18/08 |

2  OPF Copy - Long Term Record - DO NOT DESTROY

## DECLARATION OF RIXENE HICKS

In response to the questions directed to me during the investigation of my complaint against Lori Bledsoe for attacking me on June 6, 2007, I, Rixene Hicks, declare as follows,

1.    I am over the age of eighteen, have personal knowledge of the facts stated in this Declaration, and am competent to testify to the matters stated herein.

2.    I began working at the Pension Benefit Guaranty Corporation (PBGC) in March 2000, as a Program Assistant, GS-8, with PBGC's Corporate Policy & Research Department (CPRD), which later became the Policy, Research & Analysis Department (PRAD). In 2006, I applied and was selected for the position of Administrative Specialist, GS-9, located in PBGC's Equal Employment Opportunity (EEO) Office. Lori Bledsoe (GS-14), EEO Manager, was the selecting official for the position

3.    I transferred to PBGC's EEO Office in May 2006, as an Administrative Specialist, GS-9, step 9, and I held this position until I was detailed to the Office of the Chief Counsel on July 23, 2007. Ms. Bledsoe was my immediate supervisor throughout the time I worked in the EEO Office, and Acting EEO Director, James Gerber, was my second level supervisor until November 2006, when Stephanie Holder (GS-15) became the full-time EEO Director at PBGC.

4.    When I joined the EEO office, the only other full-time staff person in the Office, aside from myself, and Ms. Bledsoe, was David Williams, GS-13 EEO Specialist. I was asked by Ms Bledsoe to interview and select a student as my assistant in July 2006. Ms. Bledsoe later hired my selection, Lloyd Ellis, a Stay-In-School student who was to report to and work directly with me.

5.    As an Administrative Specialist, I performed a variety of administrative duties for the EEO Office including, but not limited to, serving as the office timekeeper, the reasonable accommodations coordinator and, certified invoices for payment. I also functioned as the EEO Counselor for employees who filed informal EEO complaints.

6.    I prepared and processed requisitions for the EEO Office using Comprizon, which is an electronic system used at PBGC for initiating and entering requisitions. When I first joined the EEO Office in May 2006, Ms. Bledsoe was paying vendors with a credit card, and there were backlogged invoices that had not been paid totaling approximately $50,000. Many of these invoices were for interpreter services rendered in FY 2005 and there were a few others. I initiated preparation of requisitions in July or August 2006 to pay these invoices so as to clear up the backlog. To the best of my knowledge they were or should have been paid.

7.    In late October or early November 2006, Ms. Bledsoe met with me, and my co-worker, David Williams, to inform us that she had not been selected for the EEO Director

Exhibit 7

position. Ms. Bledsoe seemed upset and angry during this meeting. I was concerned about paying invoices during the new fiscal year so I told Ms. Bledsoe that we needed to prepare and submit requisitions for investigative and interpreter services. Ms. Bledsoe said we should not initiate any requisitions but rather put them on hold and let the new director handle them. Ms. Bledsoe told me to put the requisitions on hold on at least 2 separate occasions before December 2006. She gave the same response at least 3 or 4 times altogether even though she knew that invoices were continually coming to me and to her so I eventually let the matter rest with her as she was the manager who reported to the Director during this time.

8.   During this same meeting, Ms. Bledsoe also informed us that she would not be moving back upstairs. At that time, the EEO Office and staff were temporarily located on the 2nd floor of PBGC's building at 1200 K Street. Our regular office space, located on the 10th floor, was being renovated; however, we were scheduled to move back upstairs on November 8, 2006. Ms. Bledsoe told us that she had to give her office to the new Director, but she would not work in a grade 13 office of the renovated space, so she would remain on the 2nd floor. Thus, except for Ms. Bledsoe, the EEO staff moved back to the 10th floor on schedule in November 2006. Ms. Bledsoe did not return to the 10th floor until April 2007 although the space was not altered for her needs; it was still the same as it was on November 8, 2006, the day we returned to the renovated space.

9.   Ms. Bledsoe told me that I would be receiving a quality step increase for the outstanding work I had done. However, Ms. Bledsoe never met with me to discuss the appraisal she had submitted on my behalf and she never provided me with a written copy of that appraisal that qualified me for the quality step increase for FY 2006. I had prepared a draft appraisal for her setting out all the work that I had done and I assumed that she used it to submit an official statement, but I never saw it.

10.   Some time in or around January 2007, Ms. Holder told me to begin submitting all requests for leave and compensatory time directly to her rather than to Ms. Bledsoe, to whom I had previously submitted these requests. Ms. Bledsoe remained my supervisor on paper, but once in a while I would have some interaction directly with Ms Holder about work assignments.

11.   On May 2, 2007, I answered the telephone call from Serena Watters, the Stay-In-School Coordinator from the HRD calling to speak with Ms. Holder about Mr. Ellis's hours as a Stay-In-School student. Ms. Watters had called Ms. Holder and me, a few months earlier, and had raised concerns about Mr. Ellis working a full-time schedule during the school year in violation of PBGC's policy. When Ms. Holder finished speaking with Ms. Watters on May 2nd, Ms Holder came to my office and said, "I think we're going to lose Lloyd."

2

Exhibit 7

12.    On May 3, 2007, Ms. Watters again called the EEO Office. Ms. Watters advised me that she had talked to Ms. Holder the previous day, and that we could no longer allow Mr. Ellis to work a full-time schedule during the school year. I asked Ms. Watters to send a confirming e-mail to all people involved in this matter. Ms. Watters sent e-mail that same day noting that she had talked to me earlier, and that Mr. Ellis would no longer be working full-time hours while school is in session. A bit later, I ran into Mr. Ellis and conveyed the message about the change in his schedule. Ms. Holder did not come in that day and Ms. Bledsoe did not arrive in the office until much later that day. Mr. Ellis said that it was not a problem because he too had received the email and that he would soon be done with the semester. Later that same day after Ms. Bledsoe arrived she told me I should not have talked to Mr. Ellis about the change in his schedule, as that message should have come from management. I apologized to Ms. Bledsoe and to Mr. Ellis the same day. *I note that at one point as the timekeeper, such action on my part would have been expected of me.*

13.    On May 4, 2007, there was an all day EEO Office staff meeting (from approximately 9:00 a.m. to 4:30 p.m.). The entire staff attended - Stephanie Holder, Lori Bledsoe, David Williams, myself, and Lloyd Ellis. Ms. Holder appeared upset from the onset of this meeting. She opened the discussion and introduced the following topics for discussion: Circumventing the Director's authority, loyalty, support, and insubordination. Also during the first part of the meeting, Ms. Holder banged her fists on the table and demanded to know if I had taken instructions from someone outside the EEO Office with respect to changing Mr. Ellis's schedule from full-time to part-time and, if I had, it would be considered insubordination, and said, "You don't want to go there!" I explained that I had not changed Mr. Ellis's schedule, but that Human Resources and Payroll Departments were requiring that we change his schedule and, that they could override anything in the system independent of what we did. Ms. Holder said that I should let her handle the matter. She never got back to me regarding changing his schedule in the records. At an early part of the meeting, Ms. Holder also asked us to comment on her management style. Mr. Williams mentioned something about having her hands-on in many things, and when it was time for me to comment, I basically agreed with Mr. Williams, because she had said when she first arrived that is how she would be.

14.    The May 4, 2007 meeting was not the first time Ms. Holder was critical of me in front of the other staff. At the first staff meeting she held in January 2007, Ms. Holder accused me of illegally spending money on the credit card that I had not even used. While Ms. Holder was reviewing the proposed agenda from the Black History Month Committee for the Special Emphasis Program, Ms. Holder banged her fists on the table during this meeting and said to me, you could go to jail because she discredited or disagreed with what was to be served on the menu. When I attempted to show her the regulation from GAO, which allowed these things for the Special Emphasis Program, hoping that it would ease her concerns, she interrupted me and banged her fist on the table again and said, "You can go to jail." Ms. Bledsoe remained silent and failed to speak up timely although

3

Exhibit 7

she knew that the program was under her direction and that was how she had always done it.

15. On May 10, 2007, Ms. Bledsoe met with me and discussed my performance. This was the first time since I had joined the EEO Office as the administrative specialists, that we had a meeting to discuss anything related to my performance. During that meeting, Ms. Bledsoe said that my performance was unacceptable *since* I had not performed the duties described in my position description. Ms. Bledsoe told me I would have to start meeting with her weekly to discuss my performance, but we did not meet again about my performance, until the day she accosted me, June 6, 2007. We did meet once, and she inquired if I has signed up for my finance class, but I recall she mainly wanted me to give her a status report on budget items: the Congressional, 2008 and 2009 and to explain to her what I was doing or whether I had done my desk instruction booklet so that anyone could come in and do my job without my being there.

16. May 30, I initiated an informal grievance against Ms. Bledsoe and verbally advised her and, Ms. Holder of my actions while I was in each of their offices respectively and that I was going to HRD to do so.

17. On June 5, 2007, Ms. Bledsoe scheduled a meeting with me to be held on June 6 from 11:30 a.m. to 12:30 p.m., Ms.Bledsoe was aware that I was again meeting with Ricardo Silva of HRD on June 6 between 10:00am-11:00 am regarding my grievance. Mr. Silva told me he would be calling Ms. Bledsoe about our meeting. Afterwards, Ms. Bledsoe told me via email that she would have to postpone our meeting until some time between 3:30 and 4:00 p.m. She emailed me again to say that we would meet at 4:00 p.m. The previous day, June 5th, Ms. Bledsoe had told me that she mainly wanted to discuss the budget line items in the new report I had designed so that she would be better prepared for a meeting with Ms. Holder on Thursday June 7. About five minutes into the meeting, which started at 4, Ms. Bledsoe received a telephone call, and indicated to me that we would finish the meeting after she took the call. I returned to my office. She had started this brief meeting by talking about an invoice from an investigative firm that was not yet overdue. Ms. Bledsoe called me again at 4:35 or 4:40; she explained that her call was taking longer than expected, and asked me how late I was planning to stay. I told her that I was scheduled to leave at 5 p.m.; she said she would make sure we met before then. Ms. Bledsoe then called me at 4:50 stating she was ready to meet so I returned to her office. When I entered the office, Ms. Bledsoe closed the door. She was sitting behind her desk, and I sat in the guest chair furthest from the door. She began by asking me about the invoice we had been discussing when we first had tried to meet. After discussing the invoice, I attempted to discuss the budget line items, which Ms. Bledsoe had previously indicated she had wanted to discuss. Ms. Bledsoe cut me off, stating that we did not have time for that matter, and that she had something more important to discuss.

4

Exhibit 7

18. Ms. Bledsoe then started to talk about the $86,000 in unpaid invoices, which were for Interpreter services rendered from October 1, 2006 to May 2007. Ms. Bledsoe explained that the amount of the unpaid invoices was large and *that she would be generous with me because I could be suspended.* I then reminded Ms. Bledsoe that when I first joined the EEO Office in May 2006, there were unpaid invoices for interpreter services that totaled $50,000, and that I had processed a requisition to pay for them and helped her by clearing up that backlog. Ms. Bledsoe indicated that $86,000 for interpreter services was more serious than $50,000. I then reminded Ms. Bledsoe that she had instructed me on more than one occasion to put everything on hold and to let the new director handle it. As a result, of her decision and her relationship with the new director, there were no requisitions in place to pay these fiscal year 07 invoices, and the reason we had ended up with $86,000 in unpaid bills. I also reminded her that I had initiated requisitions to cover these bills but neither she, or anyone else with the authority had followed through with the requisitions that I had initiated. I kept reminding her to follow through but she always said let the new director handle it. I also had told her back in February and March that our only option was to prepare a ratification, which she told me she did not want to do because of direction from Ms. Holder. It finally got done in late May or June I believe. In fact the ratification authorizing the delinquent payments for interpreter services was not granted until some time in late June 07 because of the delays that Ms. Bledsoe and/or others caused by failing to act timely. Ms. Bledsoe responded by saying, *"This is not about me, it's about you"*. Ms. Bledsoe then told me I needed to sign a memorandum which she had gathered up and stapled in my presence and was now holding in her hands. I told her it was close to 5 p.m., that I did not have time to read it, that I was not signing anything without first reading it; and why would she insist that I sign something that I didn't have time to read; that I needed a witness because of my complaint against her. I then stood up from my chair. Ms. Bledsoe hollered at me to sit down! I remained standing and repeated my request for a witness because she was being very hostile towards me. I then started walking toward the door, but by the time I got there and put my hands on the handle of the door to pull the lever down to open the door, Ms. Bledsoe had rushed and leaped from behind her desk and was blocking the door standing in front of the door; facing me and actually putting her left hand over my right hand, which was on the door handle trying to open it. It happened so fast I was shocked and frightened and very nervous. I managed to free my hand by sliding it from under hers but still kept my hand on the door handle as her back was almost touching the door, still positioned between the door and me. She then hollered, "You're not going anywhere." I asked her to please move away from the door so I could leave. Ms Bledsoe screamed, "You need to s-sit down! I pleaded with her again to let me leave. She hollered, "I'm telling you to sit down," while she was pointing and waving her right finger in my face, in and out back and forth, screaming each time she responded to my plea to leave. Then she raised her left arm above her head reaching across to the middle of the door with her fingers spread out while her left side of the body was still planted on the door and her left leg reaching out across the door. I felt sure by this time I was in trouble and no one might not be there to hear me or help so I exclaimed with all I could muster, in a high-pitch tone "why won't you let me out, why won't you let me go," but she kept pointing and

5

Exhibit 7

yelling saying you need to shut up and s-s-sit down! Her veins were bulging and her eyes were red and popping. She was so angry and I was so frightened and she was screaming at me saying"don't you know I can get you on insubordination?" I didn't know what she was going to do next. I could see she was in a rage and out of control. She was foaming and saliva was flying in my face so I backed away from the door and sat on the edge of my seat. This seemed to allow her to gain a bit more control and she said she would write that I wanted to read it first on the document. She then opened the door slightly for the first time and went to the copy machine about 4 to 5 ft away from where I was sitting, to make a copy, and she kept watching me the whole time she was at the copy machine as if she would rush up and grab me again if I tried to leave before she handed me the document.

19.    Ms. Bledsoe demanded that I sit about 5 or 6 times in total. The meeting lasted a total of about 8 minutes. When I left Ms. Bledsoe's office, I noticed that Ms. Holder was standing by the reception desk in the front of the suite, in earshot. When I went into Bledsoe's office Ms Holder was in her own office right next to Lori's with the door open. When I came out, her door was closed and I saw her standing in the hallway suite approximately 20 feet away from the scene.

20.    While at the door, Ms. Bledsoe and I were standing closer than an arms length away from each other, and Ms. Bledsoe continually screamed at me. Ms. Bledsoe's spit hit my face as she was screaming and foaming at the mouth. Ms. Bledsoe was definitely in a rage. Her eyes were bloodshot and her mouth was big and wide-opened, and the veins in her neck were bulging and red with anger.

I hereby declare under penalty of perjury under the laws of the United States of America that the above statement is true and complete to the best of my knowledge and belief.

Rixene Hicks

8/14/07
Date

6

Exhibit 7

# EXHIBIT B

Exhibit 7

## SUPPLEMENTAL DECLARATION OF RIXENE HICKS

I, Rixene Hicks, make the following declaration in support of my MSPB appeal.

1.   During the time that Ms Bledsoe was attacking me physically and verbally was a low point in my life that I will never forget. It is difficult for me to speak of it without my eyes tearing still and at times I still getting very emotional over it. She was acting so violent towards me, for a fleeting moment, I considered whether I could be having a nightmare. I felt the whole range of emotions, anger at first, then fear beyond one's imagination. I couldn't breathe, my head felt heavy and my stomach was in my chest. I thought I might even collapse. I really did not know whether she might have a weapon or just what was going to happen. I knew that it was late and that others may have already left for the day. That she might be able to overpower me because she saw my fear of her as she trapped me inside, as I had no way out and no one to hear my plea. All of this was racing through my mind. Somehow, I managed to free my hand and back away from her and eventually she let me go. When I finally saw David Williams and felt safely away from the scene, I cried off and on all the way home. I did not want my child to see me in the state that I was in, so David Williams was kind enough to stay with me and ride me about until I could calm down enough to go home.

2.   I could not sleep that night and did not want to return to the job. When my husband came home from work, he stayed up with me all night and thought I should go to see a doctor but I thought the feeling would pass if I could only sleep, but I got no sleep that night. My husband suggested he accompany me at work to address the matter because he felt that I would heal faster if I confronted the situation with the authorities at work first before involving the police. I wrote down some of my thoughts that night and declined my husband's offer to come to work with me, as I did not want to make matters worse. When reporting to work, I went directly to meet with Ricardo Silva, of Employee Relations. I was still shaken and still in shock. Ruben Moreno, the supervisor of Human Relations arranged with Facilities and Services Department to set me up in their department in a cubicle. I was depressed and didn't understand why this had happened to me; it was somewhat surreal because the attack was so malicious and intentional. I did my best to cope by still reporting to work at the temporary station in FASD and communicated via e-mail with EEO Director, Ms. Holder. I began to notice some pain in my right shoulder on or about Thursday and Friday, June 7. Below is a chronology of events beginning with the attack and subsequent to the attack:

June 6        Assault

June 7        Thursday, reported directly to HRD; communicated via e-mail with the EEO
              Office. HRD set up a workstation in FASD 4th fl.

June 8        Friday, reported to HRD, location FASD, was told Ms. Bledsoe was not in that

-1-

Exhibit 7

day and that the director needed me to process payroll in EEO, so I had to go to EEO Office-that I would be safe; Rick Silva escorted me to EEO Office; afterwards I returned to FASD. At end of the day, was told to report to FASD again on Monday, that the director needed to discuss the budget. I sent Ms. Holder an email and a spreadsheet on budget. Didn't want to go to that office again as I thought she may have had a role in the attack.

June 11    Monday -Reported to FASD.    Monday evening, was told to report to EEO on Tuesday, since Ms. Bledsoe would be working from home on flexi-place, and Ms. Holder needed to discuss the budget.

June 12    Tuesday - Reported to EEO office; did not want to go; Rick Silva escorted me and assured my safety. Ms. Bledsoe out the entire week. Ms. Holder communicated with me e-mail 3 times and once more after I was gone. Ms. Holder didn't say a word to me; Ms. Holder never discussed the budget. The pain I had noticed previously was increasing

June 13    Wednesday - Called physician, was in intense pain, out sick. The physician prescribed medication.

June 14    Thursday - Reported to EEO; feeling anxious still.

June 15    Friday, Went to physician, recommended physician specialists.

June 18    Monday - Reported to EEO, Ms. Bledsoe working from home, flexi-place

June 19    Reported to EEO, Ms. Bledsoe working form home, flexi-place

June 20    Went to physician. Remained out from work.

June 20-July 16 -- unable to work

July 17    Reported to Human Relations, sat in cubicle on the 2nd fl. No workplace set up.

July 18    Out sick, doctor's appointment

July 19    Reported to Human Relations. Remained on the 2nd fl. I was told, since the detail to the other office would not begin until July 23, I am to report to the EEO Office and the EEO Office had been trying to contact me because they needed my help to do their work. I became nervous, anxious, and trembling along with the pain in my shoulder. I went to the nurse's station on the Lower Level for about 30 minutes, received treatment, then went home for the remainder of the day.

-2-

Exhibit 7

July 20          Out sick.

July 23          Reported to the new detailed office. The EEO Director sent an e-mail to my
                 supervisor stating she still needed my help.


3.    The thought of reporting to the EEO Office became increasingly unbearable. It was almost
      as if I had to re-live that scene every time I went in the EEO office. I tried to confront the
      situation as best I could hoping that it would be over quickly and that I could return to a
      normal work environment, but the matter is still going on. I have come to realize that it
      may take much longer than I originally thought, to get beyond the threat I endured.


4.    Attached hereto are medical reports from my health care providers.


      The foregoing declaration, consisting of 3 pages, is true to the best of my knowledge and
belief and is made under penalty of perjury.


September 24, 2007                              _Rilene Hicks_
                                               RILENE HICKS


-3-

Exhibit 7